### LIGON et al. v. JOHNSTON et al.

(Circuit Court of Appeals, Eighth Circuit. September 30, 1908.)

No. 2,685.

INDIANS (§ 15*) — DISPOSITION OF INDIAN LANDS — CHOCTAW AND CHICKASAW GRANT—POWER OF CONGRESS.

The land granted by the United States to the Choctaw Nation March 23, 1842, "in fee simple to them and their descendants to inure to them while they shall exist as a nation and live on it," pursuant to the treaty of September 27, 1830 (7 Stat. 333) in which land the Chickasaw Nation obtained an interest in common with the Choctaws by a treaty between them made January 17, 1837 (11 Stat. 573), became public land of the two nations and not the property of their individual members, and the disposition of such lands as tribal property was within the domain of Congress, whose action in that regard by Act April 26, 1906, c. 1875, 34 Stat. 137 (U. S. Comp. St. Supp. 1907, p. 867), which provided for individual allotments, the disposition of unallotted lands, and the distribution of the proceeds between members of the tribes as shown by an enrollment to be completed and approved by March 4, 1907, is conclusive upon the courts, which have no power to revise such enrollment.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 37–39; Dec. Dig. § 15.*]

Appeal from the United States Court of Appeals in the Indian Territory.

Albert J. Lee and Webster Ballinger, for appellants.

James E. Humphrey and Charles W. Russell, Asst. Atty. Gen., for appellees.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. Bettie Ligon, on behalf of herself and several hundred others alleged to be similarly situated and to be of Choctaw and Chickasaw Indian descent and members of the Choctaw and Chickasaw tribes, brought suit in the United States Court for the Southern District of the Indian Territory against James R. Garfield as Secretary of the Interior, and Douglas H. Johnston and Green McCurtain, and all other persons whose names appear with theirs on the citizenship rolls of the Choctaw and Chickasaw Nations, as approved by the Secretary on or before March 4, 1907, to enjoin the distribution of the funds and the sale and disposition of the unallotted lands of those

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tribes until complainants' asserted rights as citizens of the tribes by blood are recognized and they are placed upon the rolls so they may receive allotments as such and participate with other citizens in the funds. The trial court sustained a demurrer to the bill and dismissed the suit; its action was affirmed by the Court of Appeals in the Indian Territory, and complainants appealed to this court.

The lands in question are a part of those granted by the United States to the Choctaws March 23, 1842, in compliance with the treaty entered into September 27, 1830 (7 Stat. 333), as the result of negotiations for the removal of the Indians from the states of Mississippi and Alabama to the country west of the Mississippi river, and the funds in question are proceeds of like lands. The Chickasaws obtained an interest in common with the Choctaws by a treaty between them made January 17, 1837, and approved by the President and Senate of the United States (11 Stat. 573). The treaty of 1830 with the Choctaws provided that the United States under a grant specially to be made by the President "shall cause to be conveyed to the Choctaw Nation a tract of country west of the Mississippi river in fee simple to them and their descendants, to inure to them while they shall exist as a nation and live on it," and the patent afterwards issued recited this provision of the treaty, and specified that the lands described were granted to the Choctaw Nation to be held "in fee simple to them and their descendants to inure to them while they shall exist as a nation and live on it liable to no transfer or alienation except to the United States or with their consent." When these treaties and the grant were made and the Choctaws and Chickasaws secured their titles they were slave-holding peoples, and, as was customary where that institution obtained, their slaves were regarded as chattels incapable of owning property. Following the Civil War and the abolition of slavery Congress sought to do such measure of justice to the former slaves as lay within its power. Various treaties were made by the Government with the Indian tribes to that end, among which was that of April 28, 1866, with the Choctaws and Chickasaws (14 Stat. 769), which contained a provision that all persons of African descent resident in the nations and their descendants, theretofore held in slavery, should be entitled, among other things, to 40 acres, each, of the lands of the nations on the same terms as the Choctaws and Chickasaws.

The experience of many years in their new domain west of the Mississippi river demonstrated the incapacity of the Indians for just and equitable government, and gross abuses of power marked the administration of their internal affairs. Congress finally determined to put an end to national or tribal titles, and to cause at least part of their lands to be allotted and divided in severalty among the Indians entitled thereto. A commission, generally called the "Dawes Commission," was created by Act March 3, 1893, c. 209, 27 Stat. 645, and by a series of subsequent acts and by agreements with the tribes it was intrusted with the task under the direction of the Secretary of the Interior. The commission was directed to make correct rolls of Choctaw and Chickasaw citizens by blood and also correct rolls of the freedmen of those tribes and descendants of freedmen, who were entitled to 40 acres of land under the treaty of 1866. The rolls so made were to be final

when approved by the Secretary of the Interior, and those whose names appeared thereon could alone participate in the distribution of tribal property. The act of April 26, 1906, c. 1875, 34 Stat. 137 (U. S. Comp. St. Supp. 1907, p. 867), providing for the final disposition of the affairs of the tribes, required the rolls to be fully completed by March 4, 1907, and deprived the Secretary of the Interior of jurisdiction to approve the enrollment of any person after that date. The rolls were completed and the time for change expired. The complainants say they were erroneously put upon the freedmen's rolls, and, though they are of African descent, they claim they should be enrolled as citizens by blood and consequently have a larger participation in the property to be distributed because they are also of Indian blood, being descendants of Choctaws living at the date of the treaty of 1830 or of Chickasaws living at the date of the treaty of 1837. To be more precise: Their contention is that by the treaties mentioned and the subsequent grant of 1842 from the United States an indefeasible, undivided interest became vested in each member of the Choctaw and Chickasaw tribes and their descendants without regard to the quantum of Indian blood or the admixture of African blood, and that the Indian nations merely took title in trust for the individual members and their descendants as beneficiaries; that their titles and rights to lands and moneys being vested in them are therefore beyond the power of Congress or of any administrative department of the government to impair, devest, or destroy. Complainants contend that the language of the treaty of 1830 and the grant of 1842 to the Choctaw Nation "in fee simple to them and their descendants to inure to them while they shall exist as a nation and live" on the lands granted is exceptional, and is distinguishable from that employed in other treaties and grants to other Indian tribes, often held by the courts as conveying title to the tribes and not to the individual members thereof. We do not think the contentions can be sustained. We find nothing in the history of the Choctaws, their relations to the government and the negotiations leading to their removal west of the Mississippi river, that would afford a reason for such a radical departure from the course pursued with other tribes under like circumstances, nor do we think the words of the treaty and the grant in question are so dissimilar from those employed in other cases as to indicate a different purpose. That the lands involved were public lands belonging to the Choctaw and Chickasaw Nations and not to the individual members has been assumed without contradiction from the inception of their titles through a long sequence of acts of Congress and treaties and agreements with the tribes. True, as contended, the title so held has frequently been referred to as being held in trust for the members of the tribes, but it is so only in the broad, comprehensive sense in which the public property of any representative government is in trust for the welfare of its people. Until specific, private, individual rights attach pursuant to law, the enforcement of such trusts must be at the bar of public conscience. They are not justiciable in the courts. The disposition of the tribal property of the Indian tribes falls within the legislative domain, the power of Congress is supreme, and its action is conclusive upon the courts. Cherokee Nation v. Hitchcock, 187 U. S. 295, 23 Sup. Ct. 115, 47 L.

Ed. 183; Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299.

In Stephens v. Cherokee Nation, 174 U. S. 488, 19 Sup. Ct. 722, 43 L. Ed. 1041, it was said that the lands and moneys of the Indian nations then before the court were public lands and moneys, and the acts of Congress relating to the determination of citizenship could not be successfully assailed on the ground of the impairment or destruction of vested rights; and the court was then speaking of the title of the Choctaws and Chickasaws as well as of that of the Cherokees. Whether complainants should be enrolled as citizens of the Indian Nations is a political or administrative question, and none the less so because upon its determination depends the measure of their participation in the tribal property. Wallace v. Adams, 74 C. C. A. 540, 143 Fed. 716; Id., 204 U. S. 415, 27 Sup. Ct. 363, 51 L. Ed. 547. For many years the power to determine who were and who were not citizens of these tribes was left exclusively to the tribal authorities; names were added to and stricken from the rolls at will; and when Congress, to end the arbitrary practice, intrusted the power to administrative officers of the government who had no private interests to subserve it did not change that which was of a purely political character into a subject-matter for the intervention of the courts. West v. Hitchcock, 205 U. S. 80, 27 Sup. Ct. 423, 51 L. Ed. 718.

These conclusions are fatal to the case of complainants, and the result is not affected by the charges of fraud made in the bill against subordinate officials.

Affirmed.