HAYES v. BARRINGER.

(Circuit Court of Appeals, Eighth Circuit. March 13, 1909.)

No. 2,773.

1. INDIANS (§ 15*) — REAL ESTATE — RESTRICTIONS ON DISPOSITION—"ALIENABLE" AND "INALIENABLE" INCLUDE WILLS.

The words "alienable" and "inalienable," used to restrict the disposition of lands in the Supplemental Agreement with the Chickasaws and Choctaws (Act July 1, 1902, c. 1362, 32 Stat. 642, 643, §§ 12, 15, 16), include disposition by will.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 38; Dec. Dig. § 15.*

For other definitions, see Words and Phrases, vol. 1, pp. 302–306; vol. 8, p. 7571.]

2. INDIANS (§ 15*)—EQUITY OF ENROLLED MEMBER BEFORE ALLOTMENT NOT DEVISABLE.

The right and equity of an enrolled member of the Chickasaw Nation of Indians, who died testate in 1903 before receiving an allotment, to a just share of the lands of the Chickasaws and Choctaws, was not devisable, and the title to the lands subsequently derived therefrom was not affected by the will.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 38; Dec. Dig. § 15.*]

3. INDIANS (§ 15*)—CHICKASAW WILLS AND PROBATE BY THEIR COURTS EFFECTIVE PRIOR TO 1906.

Prior to March 4, 1906, the Chickasaw Indians had the right to dispose of their devisable property by wills made in accordance with the laws of the Chickasaws, the proper Chickasaw probate court had jurisdiction to probate these wills, and its judgments are impervious to collateral attack.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 38; Dec. Dig. § 15.*]

(Syllabus by the Court.)

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the United States Court of Appeals in the Indian Territory.

For opinion below, see 104 S. W. 937.

Arthur G. Moseley and W. H. L. Campbell (Joel Terrell and C. Porter Johnson, on the brief), for plaintiff in error.

Clinton A. Galbraith (Thomas D. McKeown, on the brief), for defendant in error.

Before SANBORN and ADAMS, Circuit Judges, and RINER, District Judge.

SANBORN, Circuit Judge. In July, 1903, Sarah Hayes St. John, a full-blood Chickasaw Indian, duly enrolled and entitled to an allotment under Act June 28, 1898, c. 517, 30 Stat. 495 (the Atoka Agreement), and the Supplemental Agreement of July 1, 1902 (32 Stat. 641, c. 1362), devised all her property to the plaintiff, Ida Hayes, and died. Her will was probated and an administrator of her estate was appointed by the proper probate court of the Chickasaw Nation of Indians. This administrator selected 730 acres of the land of the Choctaw and Chickasaw Nations, and these lands were allotted to the deceased pursuant to section 22 of the Supplemental Agreement. Ida Hayes brought an action of ejectment for this land against the defendant in possession, and pleaded her title under this will. The courts in the Indian Territory sustained a demurrer to her complaint and dismissed her suit. Hayes v. Barringer (Ind. T.) 104 S. W. 937.

Prior to March 4, 1906, the Chickasaw Indians had the right to dispose of their devisable property by wills made in accordance with the laws of the Chickasaw Nation; the county and probate court of that nation for Pontotoc county, in which the will here in question was probated, had jurisdiction to hear and allow such a will; and the judgment of the probate of that will is not open to collateral attack. Act June 7, 1897, c. 3, 30 Stat. 83 (U. S. Comp. St. 1901, p. 1618); Act June 28, 1898, c. 517, 30 Stat. 495 (Curtis Act) §§ 28, 29; Atoka Agreement, 30 Stat. 512; In re Poff's Guardianship (Ind. T.) 103 S. W. 765; Gray v. Coffman, Fed. Cas. No. 5,714; Elliott v. Garvin (C. C. A., 8th Circuit) 166 Fed. 278; Mehlin v. Ice, 56 Fed. 12, 5 C. C. A. 403; Cornells v. Shannon, 63 Fed. 305, 306, 11 C. C. A. 465, 466; Buster v. Wright, 135 Fed. 947, 953, 68 C. C. A. 505.

But was the interest of this Chickasaw Indian in these lands devisable in 1903? At that time these were the lands of the Choctaw and Chickasaw Nations, held by them, as they held all their lands, in trust for the individual members of their tribes, in the sense in which the public property of representative governments is held in trust for its people. But these were public lands, and, while the enrolled members of these tribes undoubtedly had a vested equitable right to their just shares of them against strangers and fellow members of their tribes, they had no separate or individual right to or equity in any of these lands which they could maintain against the legislation of the United States or of the Indian Nations. Stephens v. Cherokee Nation, 174 U. S. 445, 488, 19 Sup. Ct. 722, 43 L. Ed. 1041; Cherokee Nation v. Hitchcock, 187 U. S. 294, 23 Sup. Ct. 115, 47 L. Ed. 183; Lone

Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299; Wallace v. Adams, 143 Fed. 716, 74 C. C. A. 540; Ligon v. Johnston (C. C. A.) 164 Fed. 670.

By the Curtis Act (30 Stat. 495), the Atoka Agreement (30 Stat. 505), and the Supplemental Agreement (32 Stat. 641), the United States and the Choctaw and Chickasaw Nations had agreed and enacted that the lands of these tribes should be allotted and conveyed to the enrolled members thereof upon certain conditions and subject to certain restrictions upon the disposition thereof which they had lawfully imposed. The testatrix had been enrolled a member of the Chickasaw Nation, but no lands had been selected or allotted to her when she died. The conditions under which she was to secure, hold, and dispose of these lands were: Where an enrolled person died subsequent to July 1, 1902, and before receiving his allotment, the lands to which he would have been entitled, if living, were to be allotted in his name and to descend to his "heirs according to the laws of descent and distribution as provided in chapter 49 of Mansfield's Digest of the Statutes of Arkansas" (Ind. T. Ann. St. 1899, §§ 1820–1843), which chapter by its express terms provides for the descent and distribution of the property of intestates only. Supplemental Agreement (32 Stat. 643) § 22. A homestead, consisting of land equal in value to 160 acres of average allotable land, selected by the allottee, "shall be inalienable during the lifetime of the allottee, not exceeding twenty-one years from the date of the certificate of allotment." Section 12 (32 Stat. 642). The remainder of the land allotted "shall not be alienable by the allottee, or his heirs, at any time before the expiration of the Choctaw and Chickasaw governments [which expired March 4, 1906 (30 Stat. 512)], for less than its appraised value," but may be alienable one-fourth in acreage in one year, one-fourth in acreage in three years, and one-half in acreage in five years, from the date of the patent. Section 16 (32 Stat. 643). Lands allotted shall not be affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land may be alienated, nor shall said land be sold except as herein provided. Section 15 (32 Stat. 642).

The courts below were of the opinion that under these restrictions the inchoate right of the testatrix to acquire these lands was not subject to devise, and counsel earnestly argue that this decision was erroneous, because the words "alienable" and "inalienable" do not include disposition by will, and because the terms of the restrictions when read together, prohibit contracts, sales, gifts, and conveyances among the living only. There is a decision of the Supreme Court of Kansas which tends to sustain the first reason given by counsel for their contention by an argument that an owner of lands does not alienate them by a devise, because it is death, and not the testator, that separates him from the lands. Vining v. Willis, 40 Kan. 609, 20 Pac. 232. But the opinion in that case is a construction of section 9, art. 15, of the Constitution of the state of Kansas, which prohibits the alienation of a homestead without the joint consent of the husband and wife. The decision is neither controlling nor very persuasive of the meaning of the words "alienable" and "inalienable" in acts of Congress and agreements with Indian Nations, where they are used to carry into effect the settled and

salutary public policy of the nation and of the tribes to prevent shrewd and intelligent men from alienating simple, unlearned, and improvident Indians and their heirs from their homesteads and lands. The question here is not whether or not it is the act of a testator or death that alienates a testator from his property; but it is: What did the Congress of the United States and the Chickasaws and Choctaws mean when they agreed and enacted that the lands of the latter should be inalienable for specified times? It is more important that rules and the meaning of words in the law of real property shall be certain and fixed than that they shall be logical, or even right. If they are certain and unchangeable, all men may safely act, and acquire and protect their rights in reliance upon them; but if they are to be changed whenever the reflection of a brilliant intellect may find, or the ingenuity of an inquiring mind may discover, some reason for a modification, there will be little security to titles in property.

Where words have acquired a well-understood meaning by judicial interpretation or definition, it is to be presumed that they were used in that sense in a subsequent statute, unless the contrary clearly appears. United States v. Trans-Missouri Freight Association, 58 Fed. 58, 114, 7 C. C. A. 15, 71, 24 L. R. A. 73. It is a familiar rule of construction that a word or term which has a common meaning, well understood, is presumed to be used in its accustomed sense. Brun v. Mann, 151 Fed. 145, 156, 80 C. C. A. 513, 524, 12 L. R. A. (N. S.) 154. The words "inalienable," "alienable," and "alienation" are familiar terms, commonly used in relation to the disposition of real estate. In their accustomed sense, and by the great weight of judicial interpretation and definition, they included the disposition of real estate by will, as well as by conveyance, when the acts of Congress and the agreements under consideration were enacted, and it was undoubtedly in that sense that Congress and the Indian Nations used them in these acts and agreements. They intended to restrict, and by the use of these terms they did restrict, the disposition of the property of the Choctaws and Chickasaws by will as well as by deed. 2 Blackstone's Comm. (Lewis' Ed.) cc. 19 and 23; Burbank v. Rockingham M. F. I. Co., 24 N. H. 550, 558, 57 Am. Dec. 300; Lane v. Maine Mutual Fire Ins. Co., 12 Me. 44, 28 Am. Dec. 150; Harty v. Doyle, 49 Hun, 410, 3 N. Y. Supp. 574, 575; Butler v. Fitzgerald, 43 Neb. 192, 204, 61 N. W. 640, 27 L. R. A. 252, 47 Am. St. Rep. 741, 750; Anderson's Law Dictionary, p. 48; Kerr on Real Property, § 267; Jackson v. Thompson, 38 Wash. 282, 80 Pac. 454, 456; United States v. Zane, 4 Ind. T. 185, 69 S. W. 842, 844, 845.

Nor do all the terms of the restrictions contained in the acts and agreements, when read and construed together, either convince or indicate that the intention of the parties to them was to forbid or limit conveyances, sales, and gifts inter vivos only. They disable the allottees, it is true, from affecting the title to their lands for limited times by deeds, debts, or obligations of any character (section 15); but they also declare that these lands shall not be alienable within terms specified (sections 12, 16). Nor is this all. They expressly provide that where, as in the case of the testatrix here, the enrolled person dies subsequent to July 1, 1902, and before receiving an allotment, her lands shall de-

scend to her heirs according to the laws of descent and distribution, as provided in chapter 49, § 22, of Mansfield's Digest. When this section was adopted there were laws of the Chickasaws and Choctaws which governed the disposition of the property of their deceased members by devise and by descent in the absence of a will. There were laws of the state of Arkansas in Mansfield's Digest which provided for the disposition of property by will (chapter 155, Mansf. Dig. [sections 3562–3620, Ind. T. Ann. St. 1899]), and by descent and distribution (chapter 49). The United States and the Chickasaw and Choctaw Nations selected the latter chapter from these various laws, and agreed and enacted that the lands allotted to an enrolled member of the Chickasaw or Choctaw tribe after his death should descend to his heirs as provided in that chapter, and there is no rational or logical escape from the conclusion that the lands in controversy in this case so descended. The equitable right to receive a just share of the lands of these Indian Nations, which the testatrix had when she made her will and when she died, was not devisable, and her will was ineffectual to deprive her heirs of it, or of the lands derived from it. Jackson v. Thompson, 38 Wash. 282, 80 Pac. 454; United States v. Zane, 4 Ind. T. 185, 69 S. W. 842, 844.

The opinion of Judge Dillon in Gray v. Coffman, Fed. Cas. No. 5,714, cited by counsel for the plaintiff, has not been overlooked. Judge Dillon there held that a will of a Wyandot Indian, made and probated according to the laws of the Wyandots, before any statutes of wills or of descent and distribution had been enacted by the Legislature of the territory of Kansas, was effectual to convey the testator's absolute right to select and to receive a patent to a section of land "never to be conveyed" by him "without the permission of the President of the United States." That decision is inapplicable to the case in hand, because the restriction in that case was on "conveyance," and in this it is on "alienation," and because in that case there was no act of Congress, agreement, or statute, other than the laws of the Wyandots, prescribing the disposition of the property upon the death of the Indian testator, while in this case there is an act of Congress, embodied in an agreement between the United States and the Indian Nations, that the right to this land and the land itself shall descend to the heirs of the testator as provided in chapter 49 of Mansfield's Digest.

The judgments below are right, and they are affirmed.