## UNITED STATES v. AARON et al.

(Circuit Court, W. D. Oklahoma. September 6, 1910.)

No. 395.

1. INDIANS (§ 15*) — LANDS — RESTRICTION ON ALIENATION BY ALLOTTEES — RIGHT OF UNITED STATES TO ENFORCE BY SUITS.

The United States may maintain a suit to set aside a conveyance of lands allotted to an Indian of the Osage Tribe in Oklahoma, in violation of the restrictions imposed by Congress on their alienation.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 17, 37; Dec. Dig. § 15.*]

2. INDIANS (§ 15*)—LANDS—RESTRICTIONS ON ALIENATION—POWER OF CONGRESS.

While the title of the Osage Indians to their lands in Oklahoma, acquired from the Cherokee Nation, pursuant to the treaty with such nation, of July 19, 1866 (14 Stat. 804), was in fee simple, such title was in the tribe, and did not vest in the individual members, and it was within the power of Congress to provide for their allotment in severalty, to prescribe the manner of their conveyance to the allottees, and to impose restrictions upon their alienation by the allottees, as it did in Act June 28, 1906, c. 3572, 34 Stat. 539.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*]

3. INDIANS (§ 13*)—LANDS—ALLOTMENT IN SEVERALTY—VALIDITY OF CONVEYANCE TO ALLOTTEE.

Under Act June 28, 1906, c. 3572, 34 Stat. 539, providing for the allotment in severalty of the lands of the Osage Indians in Oklahoma, which requires the deeds to the allottees to be executed by the principal chief of the tribe and to be approved by the Secretary of the Interior, such approval is essential to the validity of the deed, and without it the grantee acquires no title.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 13.*]

4. INDIANS (§ 15*)—LANDS—ALLOTMENTS OF OSAGE LANDS—CONVEYANCE BY HEIRS.

Act March 3, 1909, c. 256, 35 Stat. 778, which authorizes the Secretary of the Interior, pursuant to rules and regulations prescribed by him, to sell the "surplus lands" of any member of the Osage Tribe of Indians, and requires his approval before any such sale has validity, is applicable to the lands of deceased allottees.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*]

5. INDIANS (§ 15*) — LANDS — RESTRICTIONS ON ALIENATION OF ALLOTTED LANDS.

In Act June 28, 1906, c. 3572, 34 Stat. 539, providing for the allotment in severalty of the lands of the Osage Tribe of Indians, the provision of section 2, subd. 4, that the land allotted as a homestead "shall be inalienable and nontaxable until otherwise provided by act of Congress," is impersonal to the allottee, and runs with the land, and is effective against alienation after the land has descended to the heirs of the allottee.

[Ed. Note.—For other cases, see Indians, Dec. Dig. § 15.*]

In Equity. Suit by the United States against W. H. Aaron and M. L. Levin. On demurrer to amended bill. Overruled.

John Embry, U. S. Atty., and Isaac D. Taylor, Asst. U. S. Atty. George B. Denison and Burford & Burford, for defendants.

---

COTTERAL, District Judge. In this suit the complainant seeks a decree enjoining the defendants from surveying, platting, selling, or interfering with certain lands allotted to Cena June, an Osage Indian, and declaring void and canceling the deeds under which they assert title to such lands. By the averments of the amended bill, it appears that the lands involved consist of a portion of the homestead and the entire surplus land, selected as the share of Cena June in the Osage Indian lands in Oklahoma, pursuant to Act of Congress, approved June 28, 1906 (chapter 3572, 34 Stat. 539). It is alleged that after her death the principal chief of the Osages executed a deed for the homestead to her heirs, with the approval of the Secretary of the Interior, but that the Secretary has not approved the deeds for the surplus land; that she died on May 15, 1907, at the age of 29 years, leaving her husband, Howard Buffalo, as her sole heir; that no certificate of competency was issued to her; and that she made no application to the Secretary for the sale of any of these lands. It is further alleged that on March 5, 1909, Howard and Pearl Buffalo, and Joseph and Agnes Buffalohide, who never obtained certificates of competency and never applied to the Secretary for authority to sell any of the lands in controversy, executed and delivered two deeds of conveyance, purporting to convey to the defendants the said homestead tract and surplus lands allotted to Cena June, said deeds being of record in the office of the register of deeds of Osage county, that the deeds were never approved by the Secretary, and that the sales which they represent were without his approval or consent. It is also alleged that no consideration was ever received by the government, its agents or officers, for these lands, but that the considerations paid by the defendants of $1,000 for the homestead tract, and $700 and certain notes (amount unknown) for the surplus lands, are inadequate and fraudulent, that the defendants are trespassers on and taking possession of these lands, and their deeds, it is charged, are illegal, clouds upon the title, and should be removed.

The grounds of the demurrer may be summarized as follows: (1) That the government has no authority to sue as guardian or sovereign, or by request of any allottee, and is without interest entitling it to maintain the suit; (2) that the lands involved are "inherited lands," and were subject to unrestricted alienation by the adult heirs of the allottee; (3) that the court is without jurisdiction over the controversy.

An objection thus taken by the defense to the authority of the government to prosecute the suit is that its guardianship does not extend to the Osage Indians because it is dependent upon their want of citizenship; and it is contended that, inasmuch as these Indians are citizens by virtue of the provisions of the Oklahoma statehood enabling act (Act June 16, 1906, c. 3335, 34 Stat. 267), they alone have the capacity and right to conduct litigation for relief in respect of conveyances of their lands. Various cases are cited as being contrary to this view, but it is said that the case of In re Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, puts the subject at rest

in favor of the defense, and "in effect reversed all the earlier decisions in so far as they held that citizenship did not terminate government guardianship." That case primarily involved and denied the existence of the federal police power after it had been surrendered by a grant of citizenship and a subjection of the allottees to the police power of the states by virtue of section 6 of Act Feb. 8, 1887, c. 119, 24 Stat. 390, but that act, by the terms of section 8, does not apply to the Osage Indians, and, furthermore, they have not been declared subject to the police laws of the state. It may be noted that the act of June 28, 1906, which provides for the distribution of lands among the Osage Indians, recognizes a continuation of the tribe. Section 9. As no question of police power is here presented, controversies on that subject may be appropriately considered when they involve its exercise. But in the Heff Case it was said that "Congress may enforce and protect any condition which it attaches to its grants," and that "the proper tribunal may at the instance of the rightful party enforce all restraints on alienation."

The Osage lands, which constituted their reservation in Oklahoma, were acquired from the Cherokee Nation, pursuant to the treaty between that nation and the federal government of July 19, 1866, which stipulated for the settlement of friendly Indians in the Cherokee country west of 96° and the conveyance of the lands in fee simple "to each of the tribes to be held in common or by their members as the United States may decide." 14 Stat. 804. Payment was made to the Cherokees out of the proceeds of the lands of the Osages in Kansas. Act March 3, 1873, c. 228, 17 Stat. 538. On the ground that the Cherokee title was owned in fee simple, it is argued that the Osages acquired an equivalent title, and that, as title may be fully vested by treaty or law, they acquired "an absolute and unqualified title to these lands" upon the selection of allotments under the act of Congress with the consent of the government. But such title as the Osages obtained was held in common, and was in no sense vested in the individual members of the tribe. Their lands were set apart and confirmed as their reservation by Act June 5, 1872, c. 310, 17 Stat. 228. As was held with respect to the Cherokee lands, the disposition thereof is an administrative subject, under the sole control of Congress. Cherokee Nation v. Hitchcock, 187 U. S. 295, 23 Sup. Ct. 115, 47 L. Ed. 183. The actual transfer of the Osage lands appears to have been made by deed of the Cherokee Nation to the United States in trust for the benefit of the Osage Indians. It was entirely competent for the government to determine upon and execute its own plan for the division of these lands among the members of the tribe. While it is doubtless true that the titles to the lands of Indians may be vested in tribes or their members by either law or treaty, such titles do not vest in the individual members without the sanction of the government, and certainly not in a manner contrary to restrictions declared by Congress. Otherwise, the members have no power or capacity to divide or alienate their tribal lands. It was held in the case of Ligon v. Johnston, 164 Fed. 670, 90 C. C. A. 486:

"The disposition of tribal property of the Indian tribes falls within the legislative domain. The power of Congress is supreme, and its action is conclusive on the courts." Hayes v. Barringer, 168 Fed. 221, 93 C. C. A. 507.

Congressional action must therefore be looked to in this case as controlling any lawful division or transfer of the lands involved, and as a basis of determining whether any interest or duty justifies the government in its present attack on the attempted conveyances to the defendants.

The original plan and regulations adopted by Congress in the case of the Osage lands are found in the act of June 28, 1906, supra. This act provides that the selection and division of the lands shall be under the supervision of a commission, consisting of one member of the tribe to be selected by the Osage Council, and two persons to be selected by the Commissioner of Indian Affairs, subject to approval by the Secretary of the Interior, all controversies between the Indians as to their selections of lands to be settled by the commissioner, and the schedules of selections and divisions to be subject to the approval of the Secretary. Section 2, subd. 6. The deeds are required to be executed by the principal chief for the Osages, and are not valid until approved by the Secretary of the Interior. Section 8. Each member of the tribe is entitled to three selections of 160 acres each, one of them to be designated by him as a "homestead," and the other two to be known as "surplus land." Section 2, subds. 1, 2, 3. The remaining lands are to be divided as equally as practicable by a commission, etc. Section 2, subd. 5. Subdivisions 4 and 7 of section 2 and section 6 are as follows:

"Fourth. After each member has selected his or her second selection of one hundred and sixty acres of land as herein provided, he or she shall be permitted to make a third selection of one hundred and sixty acres of land in the manner herein provided for the first and second selections; Provided, that all selections herein provided for shall conform to the existing public surveys in tracts of not less than forty acres, or a legal subdivision of a less amount, designated a 'lot.' Each member of said tribe shall be permitted to designate which of his three selections shall be a homestead, and his certificate of allotment and deed shall designate the same as a homestead, and the same shall be inalienable and nontaxable until otherwise provided by act of Congress. The other two selections of each member, together with his share of the remaining lands allotted to the member, shall be known as surplus land, and shall be inalienable for twenty-five years, except as hereinafter provided."

"Seventh. That the Secretary of the Interior, in his discretion, at the request and upon the petition of any adult member of the tribe, may issue to such member a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of this act, except his homestead, which shall remain inalienable and nontaxable for a period of twenty-five years, or during the life of the homestead allottee, if upon investigation, consideration, and examination of the request he shall find any such member fully competent and capable of transacting his or her own business and caring for his or her own individual affairs: Provided, that upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation, and such member, except as herein provided, shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States: Provided, that the surplus lands shall be nontaxable for the period of three years from the approval of this act, except where certificates of competency are issued or in case of the death of the allottee, unless otherwise provided by Congress. * * *"

"Sec. 6. That the lands, moneys, and mineral interests, herein provided for,

of any deceased member of the Osage Tribe, shall descend to his or her legal heirs, according to the laws of the territory of Oklahoma, or of the state in which said reservation may be hereinafter incorporated, except where the decedent leaves no issue, nor husband nor wife, in which case said lands, moneys, and mineral interests must go to the mother and father equally."

The fact alleged as to the "surplus land" of Cena June is that the Secretary of the Interior has never approved the deeds therefor. For this reason, as provided by section 8, the deeds, although they may have been executed by the principal chief of the tribe, are still without validity. The presumption which must obtain is that the approval of the Secretary is lawfully withheld. As Congress controls the disposition of these tribal lands, and it thus made the approval of the Secretary requisite to the validity of the deeds, it must be held that the surplus lands were not effectively allotted or divided, and that title was not vested in the heirs of Cena June, nor, in turn, in the defendants as their grantees.

But in this connection some question has arisen as to whether Act March 3, 1909, c. 256, 35 Stat. 778, which authorizes the Secretary of the Interior, pursuant to rules and regulations prescribed by him, to sell the "surplus lands of any member" of the tribe, applies to the lands of deceased allottees. In the opinion of the court it is so applicable. There is nothing in the act which refers to any personal application for the privilege of sale, and the language used appears to be descriptive of the character or class of the lands to be sold. The act in authorizing the Secretary to sell the surplus lands in keeping with rules and regulations prescribed by him requires his approval before such sale has validity. As his approval is negatived by the allegations of the amended bill, the attempted conveyances to the defendants of the surplus lands are contrary to limitations imposed by Congress, and therefore for this reason are invalid.

With reference to the homestead tract, it is conceded that the deed therefor was executed by the principal chief of the tribe with the approval of the Secretary. The allotment was therefore complete. And the question is presented whether that tract descended to the heirs of the allottee, free of restriction upon alienation. The contention of the defendants is that lands which have thus descended to the heirs are no longer either "homestead" or "surplus land," and are at once subject to alienation. This, it is claimed, is clear from the act itself, and upon various other considerations which aid in its correct interpretation. On the other hand, counsel for complainant insists that the restriction is impersonal to the allottee and runs with the land; and is effective against alienation after it has descended to their heirs. In the view of this court, the latter position is correct. The act furnishes its own policy and limitations. The language used relative to the homestead in subdivision 4 of section 2 is that it "shall be inalienable and nontaxable until otherwise provided by act of Congress." The expression of the act is not that the allottee or member shall not alienate, but that the land shall be inalienable. The restriction, therefore, runs with the land, and the policy of the law is that its protection ex-

tends as well to the heirs as to the original allottees. Goodrum v. Buffalo, 162 Fed. 817, 89 C. C. A. 525.

To the restriction thus generally imposed, an exception is contained in subdivision 7 of section 2, which provides that the Secretary of the Interior may issue a certificate of competency, under the conditions named, authorizing any adult member of the tribe "to sell and convey away any of the lands deeded to him by reason of the act, except his homestead, which shall remain inalienable and nontaxable for a period of twenty-five years, or during the life of the homestead allottee." However, we are not concerned with this exception, since no certificate of competency has ever been issued by the Secretary, and the terms of this subdivision pertaining to the homestead appear to be applicable only in cases where such certificates have been issued. In the absence of a certificate as thus provided for, the homestead remains inalienable "until otherwise provided by act of Congress."

We have thus seen that the deeds assailed in this case were unauthorized and void. They were executed in violation of valid limitations imposed by Congress upon the division and alienation of the lands in question. A preliminary averment of the amended bill is that the suit is brought at the instance and request of the Secretary of the Interior and by direction of the Attorney General. The last section of Act June 28, 1906, provides:

"Sec. 12. That all things necessary to carry into effect the provisions of this act not otherwise herein specifically provided for shall be done under the authority and direction of the Secretary of the Interior."

Under the circumstances, can the government resort to this court and obtain relief for the purpose of asserting and enforcing the policy adopted by Congress with respect to the lands of the Osage Indians for the protection of the Indians and others concerned? The question has been authoritatively answered in the affirmative by the Circuit Court of Appeals for this circuit at the last May term, in an opinion rendered in the case of United States v. Allen et al., 179 Fed. 13. Aside from the question as to any estate or property of the government in these lands, the holdings in the case referred to are decisive upon the right of the government to prosecute suits in the federal Circuit Courts for the enforcement of its policy as declared by Congress, and to avail itself of appropriate remedies in equity for the cancellation of deeds executed in violation thereof, irrespective of any allegations charging fraud, or inadequacy of consideration.

The demurrer will therefore be overruled.