\* GLEASON *et al.* v. WOOD, *County Treasurer, et al.*

No. 1877. Opinion Filed March 21, 1911.

(114 Pac. 703.)

TAXATION—Property Subject—Lands of Indians. Section 4 of an act of Congress of May 27, 1908, c. 199, 35 Stat. 312, 313, entitled "An act for the removal of restrictions from part of the lands of allotees of the Five Civilized Tribes, and for other purposes." is valid, and under and by virtue thereof the lands of all allottees of the Five Civilized Tribes of Indians, from which restrictions have been or shall be removed. are subject to taxation under the general laws of the state equally with the property of all other persons.

(Syllabus by the Court.)

Kane, J., dissenting.

*Error from Superior Court, Pittsburg County; P. D. Brewer, Judge.*

Action by Michael H. Gleason and others against J. I. Wood, County Treasurer, and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

*McCurtain & Hill* and *W. L. Sturdevant,* for plaintiffs in error.

*Chas. West,* Atty. Gen., and *Charles Moore,* Asst. Atty. Gen., for defendants in error.

DUNN, J. This case presents error from the superior court of Pittsburg county; the plaintiffs being citizens and members and the original allottees of the Choctaw Tribe of Indians, and holding allotments of lands in several different. counties of the state.

The action is brought to enjoin and restrain the defendants as treasurers of these counties from collecting or attempting to collect taxes on said lands for the year 1909. It is contended by counsel that the allotted lands of the Choctaw Tribe of Indians cannot be taxed so long as the title remains in the original allottee,

---

\* Appealed to the Supreme Court of the United States.

not to exceed 21 years from the date of the patent. That bv section 29 of an act of Congress of June 28, 1898, c. 517, 30 Stat. 495, generally known as the Atoka Agreement, the United States government made a valid and enforceable contract be-tween itself and the Choctaw Nation, and that among the terms of said contract were the provisions that "all the lands allotted shall be nontaxable while the title remains in the original allottee but not to exceed twenty-one years from date of patent." That this agreement was ratified by a vote of the Choctaw Tribe of Indians and all of the provisions contained therein were adopted by them, and it is claimed that the exemption from taxation was a part of the consideration to them for entering into the same. That the exemption was not a gratuity or privilege, but on its vesting became a property right, based upon a sufficient consideration accepted by both parties, which could not be taken away by subsequent legislation. It is further contended that the Constitution of the state of Oklahoma, adopted in 1907, recognized the force and validity of this contract in section 6 of article 10 (p. 289, Snyder's Const.), wherein it is provided that:

"All property owned," etc., "shall be exempt from taxation, and such property as may be exempt by reason of treaty stipulations, existing between the Indians and the United States government, or by federal laws during the force and effect of such treaties or federal laws."

It is claimed that herein was a recognition and ratification by the state of Oklahoma of the act of Congress· above referred to, which constituted a contract between the state and the Indians which could not be abrogated by subsequent acts of Congress. May 27, 1908, Congress passed an act (c. 199, 35 Stat. 312) entitled "An act for the removal of restrictions from part of the lands of allottees of the Five Civilized Tribes, and for other purposes," among the provisions of which are the following:

"Section 1. That from and after sixty days from the date of this act the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regards restrictions on alienation or incumbrance, be as follows: All lands, in-

cluding homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions. * * * "

Section 4 of said act provides:

"That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes. * * * "

Plaintiffs state that they, and they for whom they sue, are members of the Choctaw Tribe of Indians, and Choctaw citizens, and original allottees enrolled as of September 25, 1902, and are among the number of those from whose allotments restrictions were removed by the above provisions. To the petition filed, setting forth in full the facts upon which reliance is placed to recover, a general demurrer was filed which, in due course, was heard by the court and sustained, and the case has been lodged in this court for review.

The question raised is, After these lands had been taken, under the terms and provisions of the allotment acts agreed to by the members of the different tribes, which provided exemption from taxation, did Congress have the power to remove the restrictions and to subject them, under the act of May 27, 1908, to taxation and all civil burdens, as though they were the property of other persons than the allottees of such tribes?

In an action arising in the Creek Nation, *United States v. Shock* (recently decided by Judge Campbell of the Eastern district of Oklahoma, but not yet officially reported), 185 Fed. ——, it is said:

"The Constitution of this state (section 270) provides that 'such property as may be exempt by reason of treaty stipulations existing between the Indians and the United States government, or by federal laws, during the effect of such treaties or federal laws, shall be exempt from taxation.' Congress, by the act of April 26, 1906, c. 1876, 34 Stat. 137, provided: 'That all lands upon which restrictions are removed shall be subject to taxation and the other lands shall be exempt from taxation as long as the

title remains in the original allottee.' The last-mentioned act, as its title indicates, is to provide for the final disposition of the affairs of the Five Civilized Tribes, and the lands referred to in the provision above mentioned are the lands allotted to members of the Five Civilized Tribes, the subject of the tax here involved. By act of May 27, 1908, c. 199, 35 Stat. 312, it was further provided: 'That all lands from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens, as though it were the property of other persons than allottees of the Five Civilized Tribes.' From this it is clear that, regardless of prior legislation or treaties, the intention and policy of Congress, as expressed by the two acts last referred to, was that, so long as these allotted lands remain subject to any restrictions upon alienation, they shall not be taxed by the state, but whenever all restriction upon alienation shall be removed, then such lands shall be subject to taxation and other civil burdens to which other lands are subjected. Therefore any attempt on the part of the state to tax restricted lands would be in violation, not only of the acts of Congress, enacted pursuant to its paramount and sole right to legislate regarding these lands, but would also violate the exemption expressed in the state Constitution. In view of the purpose which prompted Congress, in the first instance, to place restrictions upon the alienation of these allotted lands, and in view, also, of the purpose of Congress, as expressed in the act of 1893 [Act March 3, 1893, c. 209, 27 Stat. 646], providing for the Dawes Commission, and various subsequent acts, to prepare what was then the Indian Territory for statehood, with a view to the establishment of a state at an early date, which has now been accomplished, it is entirely reasonable that Congress should not have intended the exemption from taxation to exist longer than the time during which the lands were inalienable. *Goudy v. Meath*, 203 U. S. 146 [27 Sup. Ct. 48, 51 L. Ed. 130]. Therefore the complainant in this case cannot successfully contend that the lands of any particular class of Creek allottees were exempt from taxation by the state at any particular time, unless it appears that at such time the lands were inalienable by reason of restrictions still existing upon their alienation."

While the foregoing expresses the policy of Congress and holds that the lands from which the restrictions have been removed are available for taxing purposes by the state, the questions presented

to us appear to have been assumed, rather than considered at length; yet we believe after a full consideration of the authorities that Judge Campbell is amply sustained in the conclusion to which he came. The people of the state in the adoption of the terms of the enabling act, in effect, have disclaimed any right or authority to limit or affect the power of the government to make any law or regulation respecting Indians, their lands, property, or other rights which the government might have made, had the territory embracing the same not been created into a state, and has held as exempt the property of the Indians in accordance with the treaties or federal laws relating thereto during the force and effect of the same. So that the general laws relating to the taxation of all property within the state, for the purposes of state and municipal government under the provisions of the enabling act and the Constitution, were suspended from operating upon these lands so long as they were held inalienable and exempt from taxation by the laws of Congress. On Oklahoma coming in as a state, it yielded the right to the federal government to legislate as to this property, of either absolving it from taxation or, by removing the exemption, thereby bringing it within the operation of the general taxing system of the state. When, therefore, Congress acted and the exemption was removed, the state's power to tax by operation of law immediately attached. This, it occurs to us, is the extent, force, and effect of the provisions of the enabling act and the Constitution. The state entered into no contract with the Indian tribes or the members thereof. It made no agreement, and it received naught from them as a consideration, for the relief which they here demand. Its sole contract in reference to these matters was with Congress, wherein it agreed that it would recognize and respect its legislation. So long as Congress maintained the laws under which these lands were exempt, the state under this agreement was required to recognize the same; but when Congress repealed them, and rendered the lands the same as those of all other citizens of the state, there was no broken

pledge on its part when it enforced the same laws with reference to these lands that it did on those of all others.

But it is contended that before there was a state the members of these tribes and the allottees had taken title to these lands under and by virtue of the terms of a valid contract; that the right of exemption from taxation was a vested property right, growing out of a compliance on the part of these plaintiffs with the terms of that contract of which Congress lacked the power to strip them. It must be conceded that the treaties under which the lands were allotted, so far as they were legislative in character, were merely statutes. Hence a statute conflicting therewith subsequent thereto superseded them. *Horner v. United States et al.*, 143 U. S. 570, 12 Sup. Ct. 522, 36 L. Ed. 266; *The Cherokee Tobacco*, 11 Wall. 616, 20 L. Ed. 227; *Thomas et al. v. Gay et al.*, 169 U. S. 264, 18 Sup. Ct. 340, 42 L. Ed. 740; *Stephens et al. v. Cherokee Nation*, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041; *Lone Wolf et al. v. Hitchcock*, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299.

Speaking to this general question, the Supreme Court of the United States, in the case last cited (*Lone Wolf et al. v. Hitchcock*), said:

"Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government. Until the year 1871 the policy was pursued of dealing with the Indian tribes by means of treaties, and, of course, a moral obligation rested upon Congress to act in good faith in performing the stipulations entered into on its behalf. But, as with treaties made with foreign nations (*Chinese Exclusion Case*, 130 U. S. 581, 600, 9 Sup. Ct. 623, 32 L. Ed. 1068, 1973), the legislative power might pass laws in conflict with treaties made with the Indians. (Citing authorities.) * * * The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe

of Indians, it was never doubted that the power to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians. In *United States v. Kagama* (1885) 118 U. S. 375, 6 Sup. Ct. 1109, 3 L. Ed. 228, speaking of the Indians, the court said: * * * "The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that ·government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has ·never been denied, and because it alone can enforce its laws on all the tribes.' That Indians who. had not been fully emancipated from the control and protection of the United States are subject, at least so far as the tribal lands were concerned, to be controlled by direct legislation of Congress, is also declared in *Choctaw Nation v. United States,* 119 U. S. 1, 27, 7 Sup. Ct. 75, 30 L. Ed. 306, 314, and *Stephens v. Choctaw Nation,* 174 U. S. 445, 483, 19 Sup. Ct. 722, 43 L. Ed. 1041, 1054."

Whether the act removing restrictions and subjecting these lands to taxation was one in perfect good faith towards the Indians is a question which should be addressed to Congress, for as we view the same, unless there was a valid contract, the power under all the authorities existed. At the time of the making of the treaties and passage of the acts of Congress within which the exemptions referred to are provided for, Congress was vested with the full authority to fix the terms of the same. As was held by the authority from which we last quoted, Congress from the beginning has exercised plenary authority over the tribal relations of Indians. Not only has this power been exercised over the tribal affairs, but it is extended to the property of the members and the disposition thereof, its tenure, title, and all rights growing out of it. The individual interest therein which has been given has been by virtue of its plenary legislative authority, and the interest and title withheld has been under the same power. For, as was said by Judge Hook, in *Ligon et al. v. Johnson et al.,* 164 Fed. 670, 90 C. C. A. 486. "The disposition of the tribal property of the Indian tribes falls within the legislative domain;

the power of Congress is supreme, and its action is conclusive upon the courts," citing *Cherokee Nation v. Hitchcock*, 187 U. S. 294, 23 Sup. Ct. 115, 47 L. Ed. 183, and *Lone Wolf v. Hitchcock, supra,*. See, also, *Hayes v. Barringer,* 168 Fed. 221, 93 C. C. A. 507, and *Wallace et al. v. Adams et al.*, 143 Fed. 716, 74 C. C. A. 540. Therefore, being vested with this plenary authority, there was naught in the nature of a consideration possessed by the members of the different tribes which they could yield to Congress as a basis for the claim which is made in this and kindred cases, and in order to enforce a claim of exemption from taxation the same necessity for a proper consideration exists as if the contract were between private parties. *Grand Lodge of the State of Louisiana v. New Orleans*, 166 U. S. 143, 17 Sup. Ct. 523, 41 L. Ed. 951. This case was one wherein the Grand Lodge of F. & A. Masons of the State of Louisiana purchased and owned a certain hall in the city of New Orleans. In 1855 the Legislature of the state provided by an act for the exemption of said hall from city and parish taxation so long as it was occupied by said lodge. In 1879 a new Constitution was adopted by the state of Louisiana under which the same was made taxable, and the authorities proceeded thereunder to tax and sell the said property for the taxes. The lodge brought an action, seeking to restrain the collection, and the United States Supreme Court held that the act did not constitute a contract, and that the property was subject and liable to taxation.

The case of *County of Stanislaus et al. v. San Joaquin & King's River Canal, etc., Co.*, 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406, was one wherein the defendant in error sought to have held invalid a certain law under which its income from its water rates was sought to be curtailed. In 1862 the California Legislature passed an act for the organizing of water companies, and provided that the rents or tolls of the same should be subject to regulation by a board of supervisors of the county in which they were situated, but that they should not be reduced so low as to fail to yield the stockholders less than $1\frac{1}{2}$ per cent. per month upon the capital actually invested. This company built

its canal while this law was in force and effect. Thereafter, and in 1885, the Legislature passed an act relating to the same subject, which provided under its operation for a substantial reduction of the rates claimed under the original act. The Supreme Court of the United States, speaking through Mr. Justice Peckham, held that the company had no contract and said:

"In our belief, the language of the act of 1862 does not and was not intended to form a contract, but simply amounted to the statement of the then pleasure of the Legislature, to so remain until subsequently altered by it."

The case of *Welch v. Cook et al.,* 7 Otto, 541, 24 L. Ed. 1112, arose in the District of Columbia. In 1873 the legislative assembly of that district passed an act providing that "all property, real and personal, which may hereafter be actually employed within the limits of the District of Columbia for manufacturing purposes, shall be exempt from all general taxes for a period of ten years from the date of this act going into effect: Provided, that the value of the property so employed for manufacturing purposes shall not be less than $5,000." Thereafter and on June 20, 1874, Congress repealed the said act. Plaintiff brought this action, alleging that on the faith of the act of the legislative assembly he had expended large sums of money in improving his property, which was within the provisions of the tax-exempting act, and that in pursuance of said law the commissioners exempted the same for the year ending June, 1874, but were about to sell the same for taxes for the year 1875 under the act of Congress above mentioned. The court held that no contract was created, that the act was a bounty law which was good as long as it remained unrepealed, but that there was no pledge that it should not be repealed at any time.

In the case of *Christ Church v. Philadelphia County,* 24 How. 300, 16 L. Ed. 602, it appeared that in 1833 the Legislature of Pennsylvania passed an act which exempted Christ Church Hospital, in the city of Philadelphia, providing "that the real property, including ground rents, now belonging and payable to Christ Church Hospital in the city of Philadelphia, so long as the same shall continue to belong to the said hospital,

shall be and remain free from taxes." In the year 1851, this act was partially repealed, and a portion of the real property previously exempted was taxed. Suit was brought to restrain the same, and when the case reached the Supreme Court of the United States it was disposed of in an opinion by Mr. Justice Campbell, wherein it was said:

"The plaintiffs claim that the exemption conceded by the act of 1833 is perpetual, and that the act itself is in effect a contract. This concession of the Legislature was spontaneous, and no service or duty, or other remunerative condition was imposed on the corporation. It belongs to the class of laws denominated *privilegia favorabilia*. It attached only to such real property as belonged to the corporation, and while it remained as its property; but it is not a necessary implication from these facts that the concession is perpetual, or was designed to continue during the corporate existence. Such an interpretation is not to be favored, as the power of taxation is necessary to the existence of the state, and must be exerted according to the varying conditions of the commonwealth. The act of 1833 belongs to a class of statutes in which the narrowest meaning is to be taken which will fairly carry out the intent of the Legislature. * * * It is in the nature of such a privilege as the act of 1833 confers that it exists *bene placitum,* and may be revoked at the pleasure of the sovereign."

The case of *Wisconsin & Michigan Ry. Co. v. Powers,* 191 U. S. 379, 24 Sup. Ct. 107, 48 L. Ed. 229, likewise involved a claim somewhat similar to the one in the case at bar. May 27, 1893, the Legislature of Michigan provided, in an act for levying a specific tax on railroads, that the same, nor any other law of that state, should not apply to any railroad company thereafter building or operating a line of railroad within the state north of a certain parallel, until the same had been operated for a full period of 10 years, unless the gross earnings equaled $4,000 per mile. Thereafter a railroad company constructed a road north of the parallel, and its gross earnings never equaled $4,000 per mile, and it would have been entitled to the exemptions stated if the law mentioned was in force. In 1897 the state Legislature passed an act amending the previous act and under it taxed this road. To a bill setting up these facts, a demurrer was filed. In

sustaining the power to tax, the Supreme Court of the United
States held that no contract exempting from taxation was made
by the act of 1893, and that the levy made was valid.

Two other cases similar to the foregoing are those of *Tucker
et al. v. Ferguson et al.,* 22 Wall. 527, 22 L. Ed. 805, and *West
Wisconsin Ry. Co. v. Board of Supervisors, etc.,* 3 Otto, 595, 23
L. Ed. 814. In the former the court held that "a provision in
a state act, exempting lands specified from local taxation for three
years, was not a contract." And in the latter case it was held that
"an exemption from state taxation, which is a mere gratuity, may
be withdrawn whenever the state thinks it best for the public
welfare." Both of these cases involve the question of whether a
contract was created between the state and certain railroads which
were built under the provisions of acts of the Legislature exempt-
ing certain of their lands from taxation for various periods. In
the case last noted it appeared that in 1864 the Legislature of
Wisconsin passed an act which declared that, when the title to
the lands in question should become vested in the company, they
should be exempt from taxation for 10 years from the passage of
the act. In 1870 the exemption from taxation was further extend-
ed for 10 years; the company during this time being engaged in
the construction of a railway and selling bonds thereon, upon the
faith of the inviolability of the alleged contract exempting its
lands from taxation. In 1871 this act was so amended that cer-
tain lands of the company were rendered liable for taxation. The
company insisted that the lands having been mortgaged pursuant
to the first act and the road having been completed within the
time limited within the second, there was created a contract pro-
tected by the contract clause of the Constitution of the United
States, and that the acts abrogating the exemption were therefore
void. In the discussion of the case Mr. Justice Swayne, who pre-
pared the opinion for the court, said:

"One who has examined this case cannot look through *Tuck-
er v. Ferguson,* as reported, without being struck with the similar-
ity of the points and arguments, as well as the substantial iden-
tity of the facts, in the two cases. The latter case was carefully
considered in all its aspects by this court. It is unnecessary to

reproduce at length the views then expressed. In that case we said, 22 Wall. 575 [22 L. Ed. 805]: 'The taxing power is vital to the functions of government. It helps to sustain the social compact and to give it efficacy. It is intended to promote the general welfare. It reaches the interests of every member of the community. It may be restrained by contract in special cases for the public good, where such contracts are not forbidden. But the contract must be shown to exist. There is no presumption in its favor. Every reasonable doubt should be resolved against it. Where it exists, it is to be rigidly scrutinized, and never permitted to extend, either in scope or duration, beyond what the terms of the concession clearly require. It is in derogation of public right, and narrows a trust created for the good of all.' We hold here, as we held there, that the exemptions in question were gratuities, offered by the state, without any element of a contract. There was no assurance or intimation that they were intended to be irrevocable, or that the laws in question should not be at all times subject to modification or repeal in like manner as other legislation. If a different intent had existed, it would doubtless have been clearly manifested by the language employed. It would not have been left to encounter the possible results of such a struggle and conflict as have occurred in this litigation."

The leading case upon which counsel for plaintiff in error rely is that of *State of New Jersey v. Wilson*, 7 Cranch, 164, 3 L. Ed. 303. In that case it appears that the remnant of the tribe of Delaware Indians, previous to the year of 1758, had claims to a consideratable portion of the lands in New Jersey, to extinguish which became an object with the government and proprietors under the conveyance from King Charles II to the Duke of York. To accomplish this the government of New Jersey appointed commissioners to make a treaty with the Indians. An agreement was entered into whereby the Indians released their claim to all lands in New Jersey south of the river Rariton, and took other lands in lieu thereof. Effect was given to this agreement by an act of the Legislature, which provided: "That the lands to be purchased for the Indians aforesaid shall not hereafter be subject to any tax, any law, usage or custom to the contrary thereof, in any wise notwithstanding." Thereafter, in 1804, the Legislature of the state of New Jersey passed an act repealing the provisions

of the act which exempted the lands from taxation. On the lands
being taxed, suit was brought to restrain the same, and the Su-
preme Court of the United States held that a valid enforceable
contract had been entered into between the Indians and the gov-
ernment of New Jersey which was not subject to abrogation by
any subsequent legislation. It occurs to us that there is a differ-
ence in the situation there presented from that in the case at bar.
The Indians in that case traded lands which they owned, or on
which they had recognized claims, for other lands owned or pur-
chased for them by the state government. This was virtually an
exchange of one property which they possessed for other property
which they did not possess, and, as was found in the case, every
requisite to the formation of a contract was found in the proceed-
ing. No claim was made or recognized that the government had
power to compel this exchange, or that it could have been made
otherwise than by and through a mutual covenant. The state
secured from the Indians that which it did not possess before, to
wit, the lands which they owned, and the Indians took in lieu
thereof that which the state owned, to wit, certain other lands to
which was attached the exemption from taxation.

The pleadings before us, as we view them, disclose a situation
quite different. The title to the lands of the Five Civilized Tribes
was held by them in fee, with a reversionary interest in the gov-
ernment of the United States. The plenary power of the govern-
ment to deal with the tribal affairs and property of these races
is not an open question. Their governments existed so long as
Congress permitted them, and when, in the course of time, it be-
came obvious that statehood was approaching and could not longer
be delayed acts were passed looking to the division of the tribal
property in severalty among the members. To accomplish this,
it was provided that a roll of the members should be made, and
that they should share equally in the tribal property. This in-
volved necessarily a yielding on the part of each, when he took
his separate portion, of any claim on his part to the portions taken
by the other members, they in their turn yielding any claim on

his.  Herein is involved the consideration which it is claimed was granted by the members of the tribes for the exemption from taxation contained in the allotment acts.  The right, or at least the power, to deny consent to this program did not exist in the tribes, and when it was yielded naught was secured by Congress which it did not have prior thereto. ·

Speaking to this point, the Supreme Court of the United States in 1904, through Mr. Justice Brewer, in the case of *Re Heff,* 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848, said:

"Of late years a new policy has found expression in the legislation of Congress—a policy which looks to the breaking up of tribal relations, the establishing of the separate Indians in individual homes, free from national guardianship and charged with all the rights and obligations of citizens of the United States. Of the power of the government to carry out this policy there can be no doubt.  It is under no constitutional· obligation to perpetually continue the relationship of guardian and ward.    It may at any time abandon its guardianship and leave the ward to assume and be subjected to all the privileges and burdens of one *sui juris.*  And it is for Congress to ' determine when and how that relationship of guardianship shall be abandoned.  It is not within the power of the courts to overrule the judgment of Congress.  It is true there may be a presumption that no radical departure is intended, and courts may wisely insist that the purpose of Congress be made clear by its legislation; but when that purpose is made clear the question is at an end."

And, in a case of this character, to secure immunity from taxation, it must be based on a contract and the existence thereof must be free from doubt, for, as was said in the case of *West Wisconsin Ry. Co. v. Board of Supervisors. etc., supra,* "A reasonable doubt as to whether an exemption claimed amounts to a contract is fatal to the claim.  *Prima facie,* every presumption is against it."

If, in closing the affairs of the Five Civilized Tribes, Congress had the legal authority and power to make, and made the provisions it did make without providing for the exemptions here claimed, then the granting thereof was a mere gratuity which

could be revoked at its will; if the tribes or the members thereof yielded nothing which Congress did not already possess, then there is lacking the very essential element, consideration, to make of this statute a legislative contract. The existence of the former and absence of the latter condition we believe must be found, and, if so, forecloses plaintiffs' claims. Oklahoma, as did the state of Washington, referred to in the case of *Goudy v. Meath,* 203 U. S. 146, 27 Sup. Ct. 48, 51 L. Ed. 130, granted to Congress the power to determine how long this exemption from taxation should exist, and when Congress released it, then it was released as to the State.

In the consideration of a law, all doubts are to be resolved in favor of its constitutionality. When it is attacked, if a doubt exists, it must be resolved in its favor. The act is a federal statute, and has been held valid by the federal court sitting within the jurisdiction where these lands lie, and this conclusion is strongly persuasive with us. We do not and cannot sit in judgment on the policy of the law; our duty begins and ends with a determination of its validity—all other consideration must be addressed to the political and legislative departments of the state and nation. And, as was said by Mr. Justice Swayne in the case of *West Wisconsin Ry. Co. v. Board of Supervisors, etc., supra:*

"We hold the conclusion we have announced to be the law of this case. With its ethics we have nothing to do. That subject is not open to our consideration."

Finding, therefore, as we do, that the act is constitutional, the judgment of the trial court is sustained.

TURNER, C. J., and HAYES and WILLIAMS, JJ., concur; KANE, J., dissents.