HAYES VS BARRINGER.

Opinion delivered Sept. 26, 1907.

(104 S. W. Rep. 937).

1. *Indians—Courts—Jurisdiction.*

The courts had jurisdiction in an instance where a Chickasaw Indian's will was executed July 26, 1903 and probated August 9, 1903. From the enactment of Act Cong. June 28, 1898, c. 517, 30 Stat. 495 until the enactment of Act Cong. April 28, 1904, c. 1824, 33 Stat. 573, which took away from the Indian courts all jurisdiction the tribal courts of the Choctaw and Chickasaw Nation had jurisdiction over matters with regard to Indian estates. But under the Atoka agreement, the question as to whether the land attempted to be devised was alienated came within the jurisdiction of the United States Courts, even though the tribal courts had probate jurisdiction.

2. *Same—Homestead.*

Under Supplemental Agreement § 12, ratified by Act Cong. July 1, 1902, c. 1362, 32 Stat. 641, a Chickasaw Indian cannot alienate his homestead until 21 years have elapsed after the date of the allotment.

3. *Same.*

The only difference between homestead and surplus, or other half of the Indian's land, is in the length of time which must elapse before it is alienable.

Error to the United States Court for the Southern District of the Indian Territory; before Justice J. T. Dickerson, March 31, 1906.

Action by Ida Hayes against John L. Barringer. From a judgment for defendant, plaintiff brings error. Affirmed.

This is an action in ejectment, brought by the plaintiff in error, Ida Hayes, for the recovery of the possession of certain land named in the complaint. The plaintiff is a Chickasaw Indian. The complaint alleges that she is the owner and

entitled to possession of the land in controversy. She deraigns her title and right of possession through the last will and testament of one Sarah Hayes St. John, who died on July 29, 1903. The will, executed on July 26, 1903, is as follows: "I make this will as a last will and testament and that upon my death. I will give a place, house and field to Ida Hayes. I do not have anything to eat for any person. I do not have anything much. I will give the cows to Ida Hayes. I will give everything to Ida all that I have. Sarah Hayes. Witnessed: James Perry. Lee Perry." The will was duly probated in the Probate Court of Pontotoc county, Chickasaw Nation, on August 29, 1903. The land in suit is the allotment of plaintiff's testator, Sarah Hayes St. John. The allotment, not having been made during her life, was secured by her administrator and made to her estate after her death. A demurrer was interposed to the complaint, as follows: "Now comes John L. Barringer, the defendant in the above-entitled action, leave of the court being first obtained, and files his amended demurrer to the plaintiff's petition herein, and for cause and ground of demurrer avers as follows: (1) That the petition does not state facts sufficient to constitute a cause of action against this defendant, in this: that it appears therefrom that the title alleged to be in the plaintiff to the land in controversy is devised through an alleged devise of one Sarah Hayes St. John, a full-blooded Indian, and that said Sarah Hayes St. John had no power to convey or devise real estate by will, or to alienate the same in any other manner. (2) That it does not appear from the alleged will attached to the petition that the devisor intended to devise any land thereby. (3) That said pretended will is void, first, for uncertainty; second, because no reference is made therein to the heir or heirs of the devisor. Wherefore," etc. The court, in sustaining the demurrer, entered the following judgment. "Now, on this 31st day of March, A. D. 1906, the above cause coming on to be heard on the defendant's demurrer to the

plaintiff's petition, the plaintiff being represented by her attorneys, Campbell & Terrell, the defendant being represented by his attorneys, Galbraith & McKeown, and the court being fully advised in the premises, it is considered that Sarah Hayes St. John, through whose will the plaintiff claims title to the premises in controversy, was without testamentary capacity and had no power to devise the said premises by will, and that the demurrer to the petition is well taken, and should be sustained. It is therefore ordered, adjudged, and decreed that the demurrer to the petition be sustained, and that the cause be and the same is hereby dismissed, and that the defendant recover," etc.

*W. H. L. Campbell* and *Joel Terrell*, for plaintiff in error.

*Clinton A. Galbraith* and *Tom D. McKeown*, for defendant in error.

CLAYTON, J. (after stating the facts as above). Without passing upon the question as to the sufficiency of the terms of the will to indicate the intention of the testator to convey her anticipated allotment to the devisee, we will pass to a consideration of the points argued in the briefs.

It is the law, and it is conceded, that, if at the time this will was executed and probated the chapter of Mansfield's Digest of the Laws of Arkansas relating to wills was in force as to the Choctaw and Chickasaw Nations, then the will, not conforming to the provisions of that chapter, was not entitled to probate, and conveyed no estate. In the case of In re Guardianship of Maggie May Poff, 103 S. W. 765, in which the opinion was handed down by us at the last term of this court, but not yet published, we held that from the date of the enactment of the Curtis bill (Act June 28, 1898, c. 517, 30 Stat. 495) to the enactment of the act of April 28, 1904, c. 1824, 33 Stat. 573, which latter act took from the Indian tribes all jurisdiction, the Chickasaw Nation and its courts had exclusive jurisdiction of all probate and guardianship matters as to Indians and their

estates. See, also, Crowell vs Young, 4 Ind. Ter. 148, 69 S. W. 829; George vs Robb, 4 Ind. Ter. 61, 64 S. W. 615. And, this will having been executed and the testator having died, and the will having been probated in the Chickasaw Courts during the period of time that the courts of that nation had jurisdiction, and the will having been executed in conformity with their laws, which was specially pleaded in the complaint, it was effectual to convey title to such real estate owned or possessed by the testator as she was under the law capacitated to convey, and had described in the will. But, while we hold that the Chickasaw Court was at that time the proper tribunal in which to probate the will, we do not concede that the will relating to the disposition of the land is to be construed by the provisions of the Chickasaw statutes. If so, then the will is void, because by the law of that nation the fee to land could not be conveyed, either by grant or devise at all. While section 29 of the Curtis bill had the effect of restoring to the Choctaw and Chickasaw Nations, to a large extent, the jurisdiction taken from them by the act of June 7, 1897 (30 Stat. 505, c. 517), still by its very terms it left all of the provisions of the Curtis bill in force which were not in conflict with the agreement; and the agreement itself provides that the United States Courts now existing, or that may hereafter be created in the Indian Territory, shall have exclusive jurisdiction of all controversies growing out of the title, ownership, occupation, possession, or use of real estate of the Choctaw and Chickasaw tribes. And there-fore, while the probate of the will was within the jurisdiction of the courts of the Chickasaw Nation, all questions of title, ownership, occupation, or use of real estate were within the jurisdiction of the United States Court. And section 25 of the agreement, as well as sections 12 and 16 of the supplemental agreement, provide that the lands shall not be alienated except as therein provided. And these provisions, although enacted by Congress, having been agreed to by the Chickasaw people,

are their laws, which, by the agreement, are to be enforced by the United States Courts. Therefore, if it be conceded that the will is in its terms sufficiently certain to show an intention upon the part of the testator to convey her allotment, then the only question is: Did the law at that time permit allotted and to be devised by will by a Chickasaw Indian? And this depends upon the question as to whether or not a conveyance of land by devise in a will is an alienation of the land.

The statute in force at the time of the execution of the will and the death of the testator was the supplemental agreement, ratified by Act Cong. July 1, 1902, c. 1362, 32 Stat. 641, the twelfth and sixteenth sections of which are as follows: "Sec. 12. Each member of said tribes shall, at the time of the selection of his allotment designate as a homestead out of said allotment land equal in value to one hundred and sixty acres of the average allottable lands of the Choctaw and Chickasaw Nations, as nearly as may be, which shall be inalienable during the lifetime of the allottee, not exceeding twenty one years from the date of the certificate of allotment, and separate certificate of allotment shall issue for said homestead." "Sec. 16. All lands allotted to members of said tribes, except such land as is set aside to each for a homestead as herein provided, shall be alienable after issuance of patent as follows; one fourth in acreage in one year; one fourth in acreage in two years, and the balance in five years; in each case from date of patent; provided, that such land shall not be alienable by the allottee or his heirs at any time before the expiration of the Choctaw and Chickasaw tribal government for less than its appraised value." As far as the provisions of section 12 are concerned, it is clear that the homestead cannot be alienated by the allottee until 21 years shall have elapsed, if he live that long. If he do not live that long, then, inasmuch as in that event it cannot be alienated until his death, it cannot be alienated at all by him before the expiration of the 21 years; and therefore, if a will

executed by him within the 21 years divesting his estate of the title to the land be an alienation of the land, it would be void. Is it an alienation within the meaning of the statute? Land is the gift of nature. In its original condition, by her laws, all men were entitled to an equal use of it. But for the good and the convenience of society the law of the state permits every individual to possess and hold to his use as much as he may lawfully acquire. But, recognizing the fact that men can only hold and enjoy the use of land so long as they shall live, the law has dug a channel down which the title flows after death. It leads to the heir, and from the heir to his heir, and so on through all time. The owner of the fee may deflect the channel so as to cause it to flow past the heir into the hands of strangers in two ways: First, by a grant, evidenced by a deed; second, by a devise, evidenced by a will. In both instances the act is done by the owner of the fee. It is his deed, and his will, and his act, done in his lifetime, and the result is the same. The inheritance is cut off, the expectancy of the heir is defeated, the title is divested so as to become the head of a new ancestral line of inheritance by the one way as fully and to the same effect as by the other. All agree that, if it be done by grant, it is an alienation of the land. Then, why not an alienation if done by devise? What difference does it make that the separation of the title from the grantor or devisor occurred before or at the time of death if the result was caused by the act of the owner done in his lifetime? There can be no question but that at the common-law alienation of realty was effectual as well by devise as by grant. "As understood at common law, to alienate real estate is voluntarily to part with the ownership of it, either by bargain and sale, or by some conveyance, or gift or will. The right to alienate was a right which the owner had over the real estate to divest it from the heir. Alienation differs from descent, in this: that alienation is effectual by voluntary act of the owner of the property, while descent is the

legal consequence of the decease of the owner, and is not changed by any previous act of volition of the owner. A sale and conveyance is an alienation that takes effect from the time of the transfer, while a devise is an alienation that takes effect on the decease of the testator, or according to the terms of the will. But property not transferred or devised is not alienated according to the principles of the common law." Burbank vs Rockingham Ins. Co., 24 N. H. 550, 57 Am. Dec. 300. Blackstone, in the second volume of his Commentaries, says: "The most usual and universal method of acquiring a title to real estate is that of alienation. Conveyance or purchase in its limited sense, under which may be comprised any method wherein estates are voluntarily resigned by one man and accepted by another, whether that be effected by sale, gift, marriage, settlement, devise, or other transmission of property by the mutual consent of the parties." 1 Cooley's Blackstone, 286. Treating of the four methods of alienation (Id. 294), the same learned author says: "The fourth takes no effect till after death, and that is by devise contained in his last will and testament"—and devotes a whole chapter to a discussion of "Alienation by Devise." Id. 370. In speaking of the importance of the doctrine of the law of descent, he says: "The doctrine of descents, or law of inheritances in fee simple, is a point of the highest importance, and is, indeed, the principal object of the law of real property in England. All the rules relating to purchase, whereby the legal course of descents is broken or altered perpetually, refer to this settled law of inheritance as a dictum or first principle universally known and upon which their subsequent limitations are to work." Id. 201. It is our opinion that alienation of land occurs in every instance when the legal course of descent has been broken and altered by the effect of an instrument executed by the owner of the fee, whether by its terms it takes effect immediately, or at the death of the party executing it. This is certainly true at common law, and we have not been

able to find any statute, conditions, or authoritative judicial opinions or judgments that have changed the course of the common law in this particular.

We have been referred to the case of Vining vs Willis 40 Kan. 609, 20 Pac. 232, in which it is squarely held that title to land passing by will is not an alienation of the land in the sense of the Kansas Constitution, forbidding the alienation of a homestead without the joint-consent of the husband and wife, when that relation exists. In that case the court undertakes to show that alienation does not mean the diversion of the title to realty from the line of descent, but says: "The word as used in the Constitution we think means a voluntary parting with or surrendering of some interest in the homestead; and a person never parts or surrenders anything by virtue of a will, but only by his subsequent death." That is, if he should not die, he would not part with it. If he does die, he does not part with it, because he is dead. And, if it be true that alienation as applied to real estate means only the passing of the title from the individual owner of the fee so that he personally surrenders some interest that would affect him in his lifetime, and not a diversion of the title from the line of inheritance and breaking up and altering the legal course of descent, then the position is tenable. But, if this is what is meant, we respectfully differ from that court. That decision, however, is based on a construction of the homestead clause of the Kansas Constitution, and it is held that within the meaning of that constitutional provision a devise of a homestead is not an alienation; and this is all that is decided.

The homestead of Indian lands, as provided for by the statute of the United States, is not the same as, and was not established for the purpose that controlled the Legislatures in the states generally in the establishment of ordinary homesteads. A "homestead," as the word is usually used in the statute, is established to secure a home free from the debts of

the head of the family, and inalienable by him, and for the benefit of the family. Here the homestead right is not vested in the head of the family, as its head, or created for its benefit, for every member of the family, from the father to the babe in its mother's arms, is vested with a homestead, and all of equal value. A family, we will say, of husband and wife and five children, is vested with seven homesteads, and only one is owned by the head of the family; and, as each member of the family, including the wife, is the owner of a homestead, the necessity does not exist that one vest in the father as the head of the family for the benefit of the others, and Congress, in the use of the word, evidently did not intend that it should be used in that sense. In the supposed case, six of the seven homesteads are vested in persons who are not heads of families and therefore as to them it could not possibly have that meaning. Take a one year old Chickasaw girl with a homestead which the statute gives to her, and what resemblance is there between that and the homestead provided by the statutes of the states? Yet the homestead is the same in all particulars, except locality, as that of her father. The homestead of a Chickasaw Indian differs in no particular from his "surplus," as the other half of his land is called, except in the length of time in which it is made inalienable. Neither is subject to taxation, neither is subject to execution, and both are inalienable for a term; the only difference being that the homestead is made inalienable for 21 years if the owner shall live so long, if not then at his death; the other in 1, 3, and 5 years. What signification, then, is there in the word "homestead" as used by the statute? And how does it affect the question being discussed? Congress doubtlessly fixed the longer term in which the one tract should remain inalienable than the other, with the expectation and the hope that the Indian owner would be induced thereby to build his home upon it; but he is not required to do so. He may lawfully build his home upon the surplus and leave his

homestead homeless and tenantless, and still, under the statute, it would remain his homestead. We repeat, what signification, then, is there in the word, except to express the hope of Congress, and designate the one tract from the other? A mere name, growing out of an expectation. It seems clear to us that the idea that any part of the lands attempted to have been devised by the will in this case, in the sense of the meaning of the word in the Kansas Constitution, or of the Legislatures of the states generally, is a homestead, should be discarded and eliminated, and the case decided as if the word "homestead" did not appear in the statute; and, if that be done, the Kansas case is not an authority upon the question before us. Section 15 of the supplemental agreement, supra, provides that: "Lands allotted to members and freedmen shall not be affected or incumbered by any deed, debt or obligation of any character, contracted prior to the time at which said land may be alienated under this act; nor shall said lands be sold except as herein provided." While this section does not specifically state that an allottee shall not dispose of his allotment by will until the time when the land might be alienated, it goes far to show the intention of Congress that the Indian allottee was to be put in such a position in relation to the lands that, when the time should come when the lands might be disposed of, they would be unincumbered in the hands of their Indian owners, and during the period of inalienableness they would not be permitted to succumb to the temptation held out to them by speculation to sell their lands by deed to take effect immediately or in the future, or by devise to be enjoyed after their death, by aliens to their race, to the exclusion of their heirs. It is our opinion that a devise to Indian lands in the Choctaw and Chickasaw Nations, whether it be to convey the fee of what is termed a "homestead" or the "surplus," if executed during the period when by the statute the land is declared to be inalienable, is void. That is, that the allottee, so far as the socalled home-

stead is concerned, can transfer it by deed or by will only after the expiration of the twenty-one years, and, as to the surplus, after the expiration of the one, three, and five years, as provided by the statute.

Finding no error in the proceedings of the court below, the judgment is affirmed.

GILL, C. J., and TOWNSEND and LAWRENCE, JJ., concur.