## CRINER v. FARVE *et al.*

No. 3875·   Opinion Filed January 19, 1915.

(146 Pac. 10.)

**INDIANS—Indian Lands—Devise.** Where a full-blood Mississippi Choctaw Indian dies in 1907, after he has been duly identified and resided upon the lands of the Choctaw Nation for the required length of time, as provided by act of Congress approved July 1, 1902 (32 St. at L. 651·), but before proof of a continuous **bona fide** residence is made as required by section 42 of said act, and before patent is issued, such Mississippi Choctaw does not have a devisable interest in such lands, and the title to the lands acquired by the heirs after his death under section 5 of the act of April 26, 1906 (34 St. 138), is not affected by a will made prior to such proof.

(Syllabus. by Rittenhouse, C.)

*Error from District Court, Carter County;*

*S. H. Russell, Judge.*

Action by Madalena Farve and others against John B. Criner. Judgment for plaintiffs, and defendant brings error. Affirmed.

*Potterf & Walker,* for plaintiff in error.

*T. L. Wright* and *Thomas Norman,* for defendants in error.

Opinion by RITTENHOUSE, C.   Joseph Baptiste and Felicie Baptiste were full-blood Mississippi Choctaw Indians, duly united in marriage, and there were born of said marriage the following children: Madalena Farve, *nee* Baptiste, Louisa Gardner, *nee* Baptiste, Joseph Baptiste, Jr., John Baptiste, and Sam Baptiste—who were enrolled by the Commissioner to the Five Civilized Tribes as full-blood Mississippi Choctaw Indians, and together with Felicie Baptiste and R. E. Gardner instituted this action in ejectment against John B. Criner to recover possession of the northwest quarter of the northwest quarter of section 21, township 5 south, and range 1 east; also lot No. 7, less 1.89

acres for Gulf, Colorado & Santa Fe Railway Company, of section 6; and lot No. 3, less 3.1 acres for the Gulf, Colorado & Santa Fe Railway Company, of section 7 in township 5 south, and range 2 east; also the north half of the southeast quarter of the southeast quarter, of section 1, township 5 south, and range 1 east, in the Chickasaw Nation, Indian Territory.

On February 14, 1903, Joseph Baptiste and Felicie Baptiste were duly and legally identified as Mississippi Choctaws. Afterwards, but before proof of residence was made as required by section 42 of the Act of July 1, 1902, Joseph Baptiste attempted to alienate by will all of the above described premises to John B. Criner, who was not in any manner related to him. On or about the 25th day of September, 1907, Joseph Baptiste died, leaving surviving him his wife and the children, hereinbefore mentioned, without having made proof as provided by the act of 1902, *supra*. It appears from the pleadings that Joseph Baptiste moved to and took up his residence within the Choctaw Nation and continuously resided there, until in about March, 1907, when he went to the state of Louisiana, where he died. After his death, his heirs, on July 29, 1908, submitted proof under section 21 of the act of 1906 of his continuous residence in the Choctaw Nation for the time required by section 42 of the act of July 1, 1902. The lands in controversy had been selected as his prospective allotment, but no certificate of allotment or patent was ever issued to him in his lifetime, nor was any proof submitted relative to the required residence during his lifetime. The only proof ever made showing such continuous residence, as required by said section, was made by the heirs after his death.

The manner of acquiring title to the tribal lands in the Choctaw Nation by a Mississippi Choctaw differs somewhat from the manner of acquiring title to said land by a native Choctaw. Sections 41, 42, 43, and 44 of the act of Congress approved July 31, 1902, commonly called the "Supplementary Treaty," reads as follows:·

"41. All persons duly identified by the Commission to the Five Civilized Tribes under the provisions of section 21, of the

act of Congress approved June 28, 1898 (30 Stats. 495), as Mississippi Choctaws entitled to benefits under article 14 of the treaty between the United States and the Choctaw Nation concluded Sept. 27, 1830, may, at any time within six months after the date of their identification as Misisssippi Choctaws by the said Commission, make *bona fide* settlement within the Choctaw-Chickasaw country, and upon proof of such settlement to such Commission within one year after the date of their said identification as Mississippi Choctaws shall be enrolled by such Commission as Mississippi Choctaws entitled to allotment as herein provided for citizens of the tribes, subject to the special provisions herein provided as to Mississippi Choctaws, and said enrollment shall be final when approved by the Secretary of the Interior. The application of no person for identification as a Mississippi Choctaw shall be received by said Commission after six months subsequent to the date of the final ratification of this agreement and in the disposition of such applications all full-blood Mississippi Choctaw Indians and the descendants of any Mississippi Choctaw Indians whether of full or mixed blood who received a patent to land under the said fourteenth article of the said treaty of 1830 who had not moved to and made *bona fide* settlement in the Choctaw-Chickasaw country prior to June 28, 1898, shall be deemed to be Mississippi Choctaws, entitled to benefits under article 14 of the said treaty of Sept. 27, 1830, and to identification as such by said Commission; but this direction or provision shall be deemed to be only a rule of evidence and shall not be invoked by or operate to the advantage of any applicant who is not a Mississippi Choctaw of the full blood, or who is not a descendant of a Mississippi Choctaw who received a patent to land under said treaty, or who is otherwise barred from the right of citizenship in the Choctaw Nation. All of said Mississippi Choctaws so enrolled by said Commission shall be upon a separate roll.

"42. When any such Mississippi Choctaw shall have in good faith continuously resided upon the lands of the Choctaw and Chickasaw Nations for a period of three years, including his residence thereon before and after such enrollment, he shall, upon due proof of such continuous, *bona fide* residence, made in such manner and before such officer as may be designated by the Secretary of the Interior, receive a patent for his allotment, as provided in the Atoka agreement, and he shall hold the lands allotted to him as provided in this agreement for citizens of the Choctaw and Chickasaw Nations.

"43.   Applications for enrollment as Mississippi Choctaws, and applications to have land set apart to them as such, must be made personally before the Commission to the Five Civilized Tribes.   Fathers may apply for their minor children; and, if the father be dead, the mother may apply; husbands may apply for wives.   Applications for orphans, insane persons and persons of unsound mind may be made by duly appointed guardian or curator, and for aged and infirm persons and prisoners by agents duly authorized thereunto by power of attorney, in the discretion of said Commission.

"44.   If, within four years after such enrollment, any such Mississippi Choctaw, or his heirs or representatives if he be dead, fails to make proof of such continuous *bona fide* residence for the period so prescribed, or up to the time of the death of such Mississippi Choctaw, in case of his death after enrollment, he, and his heirs and representatives if he be dead, shall be deemed to have acquired no interest in the lands set apart to him, and the same shall be sold at public auction for cash, under rules and regulations prescribed by the Secretary of the Interior, and the proceeds paid into the treasurer of the United States to the credit of the Choctaw and Chickasaw Tribes, and distributed *per capita* with other funds of the tribes. Such lands shall not be sold for less than their appraised value.   Upon payment of the full purchase price patent shall issue to the purchaser."

The Mississippi Choctaw, unlike the Native Choctaw, had no right to the land, or a patent thereto, until after he had satisfactorily proved his three years' residence, as provided by section 42, *supra.* The act of April 26, 1906 (34 St. 137), provides that, in the event of the death of an allottee before his patent became effective, it should issue in his name, but that the title to the land should inure to and vest in his heirs. The effect of this was to vest in the heirs the absolute title to said land, provided they could make the necessary proof that the deceased had continuously resided thereon as provided by the act of Congress, *supra.* Joseph Baptiste did not die until a year after the passage of the act of 1906, *supra.* After his death, the heirs made the necessary proofs, and the patent was issued to Joseph Baptiste.   The title under section 5 of the 1906 act, while allotted in his name, was for the benefit of the heirs; and under said action the same inured to and vested in the heirs of the said

Joseph Baptiste. Section 5 of the act of April 26, 1906, reads as follows:

"That all patents or deeds to allottees in any of the Five Civilized Tribes to be hereafter issued, shall issue in the name of the allottee, and if any such allottee shall die before such patent or deed becomes effective, the title to the lands described therein shall inure to and vest in his heirs."

The sole and only question in this case then is: Did Joseph Baptiste have a devisable estate in these lands at the time of his death? If he did, then they passed to John B. Criner by virtue of said will. If he did not, then the defendants in error own them by virtue of being his heirs. This court held in the case of *Semple v. Baken,* 39 Okla. 563, 135 Pac. 1141, that:

"A will of a member by blood of the Choctaw Tribe of Indians made during or before the year 1904, before she had been enrolled as a member of the tribe, and before her allotment had been selected, was ineffectual to convey her allotment."

And in that case the will was held invalid because it was an attempt to alienate the allotment made before the removal of restrictions, and the following cases were cited: *Taylor v. Parker,* 33 Okla. 199, 126 Pac. 573; *Hayes v. Barringer,* 7 Ind. T. 697, 104 S. W. 937, affirmed 168 Fed. 221, 93 C. C. A. 507; *Bledsoe v. Wortman,* 35 Okla. 261, 129 Pac. 841; *Lynch v. Franklin,* 37 Okla. 60, 130 Pac. 599.

In the case of *Hayes v. Barringer,* 168 Fed. 221, 93 C. C. A. 507, the court says:

"The right and equity of an enrolled member of the Chickasaw Nation of Indians, who died testate in 1903 before receiving an allotment, to a just share of the lands of the Chickasaws and Choctaws, was not devisable, and the title to the lands subsequently derived therefrom was not affected by the will."

In the same case it was held that:

"The United States and the Chickasaw and Choctaw Nations selected the latter chapter from these various laws, and agreed and enacted that the lands allotted to an enrolled member

Wash. 282, 80 Pac. 454; *United States v. Zane,* 4 Ind. T. 185, 69 S. W. 842."

In *Coachman v. Sims et al.,* 36 Okla. 536, 129 Pac. 845, this it, or of the lands derived from it. *Jackson v. Thompson,* 38 of the Chickasaw or Choctaw Tribe after his death should descend to his heirs, as provided in that chapter; and there is no rational or logical escape from the conclusion that the lands in controversy in this case so descended. The equitable right to receive a just share of the lands of these Indian Nations, which the testatrix had when she made her will and when she died, was not devisable, and her will was ineffectual to deprive her heirs of court held that:

"A full-blood Creek Indian, who died in March, 1900, could not dispose, by will, of lands subsequently allotted to his heirs."

In the case of *Sanders v. Sanders,* 28 Okla. 59, 117 Pac. 338, a controversy arose as to whether Sarah E. Sanders, at the date of her death, had an inheritable estate in her allotment, and the court, construing section 28 of the act of March 1, 1901 (31 St. 869), held that:

"We are therefore of the opinion that, when Sarah E. Sanders appeared before said Commission, filed on and took possession of her allotment, and died, she had no vested right therein and was at that time seized of no inheritable estate in said land."

In the case of *Hall v. Russell,* 101 U. S. 503, 25 L. Ed. 829, the court construed the Oregon Donation Act (Act Sept. 27, 1850, 9 St. at L. 496). Section 4 thereof provided that if the settler resided upon said lands and cultivated the same four years, and otherwise conformed to the provisions of the act, he should be granted certain lands; that, if he died before patent issued, the surviving spouse, children, and heirs should be entitled to the interest of the deceased, unless it had been disposed of by will. Section 7 provided that, the preliminary proof of settlement having been made, the settler, after four years, should make final proof of continued residence for the prescribed time. Section 8 of said act provided that if the settler

died before the expiration of the four years' continued posses-
sion, as required by the act, all the rights of the deceased under
the act should descend to the heirs at law of such settler, includ-
ing the widow, where one is left, in equal parts; and that proof of
compliance with the conditions of the act up to the time of the
death of the settler should be sufficient to entitle them to a pat-
ent.    In the foregoing case a party named Loring settled upon
certain land under the act and resided upon it until his death,
which was prior to the four years' residence required.    Prior to
his death he devised the lands to a party named Hall, who sub-
sequently died, whereupon a controversy arose between the
heirs of the devisee Hall and the administrator of Loring as to
the ownership of the land.    The statute then under consideration
did not recite that the failure to make proof forfeited the party's
rights, while the Mississippi Choctaw statute does so specifically
provide.    In the Hall case the court said:

"Coming, then, to the present case, we find that the grantee
designated was any qualified 'settler or occupant of the public
lands    *    *    *    who shall have resided upon and cultivated
the same. for four consecutive years, and shall otherwise con-
form to the provisions of the act.'    The grant was not to a set-
tler only, but to a settler who had completed the four years of
residence, etc., and had otherwise conformed to the act.    When-
ever a settler qualified himself to become a grantee, he took the
grant, and his right to a transfer of the legal title from the Unit-
ed States became vested.    But, until he was qualified to take,
there was no actual grant of the soil.    The act of Congress
made the transfer only when the settler brought himself within
the description of those designated as grantees.    A present right
to occupy and maintain possession, so as to acquire a complete
title to the soil, was granted to every white person in the terri-
tory having the other requisite qualifications, but beyond this
nothing passed until all was done that was necessary to entitle
the occupant to a grant of the land.    Whether the fee passed out
of the United States before the claim was 'proved up,' it is not
necessary now to consider.    For the purposes of the present
suit, it is enough to show that the occupant got no title himself,
beyond that of a mere right of possession, until he had com-

pleted his four years of continued residence and cultivation.  *
*  *

"We conclude, therefore, that under section 4 there was no
grant of the land to a settler until he had qualified himself to
take as grantee by completing his four years of residence and
cultivation, and performing such other acts in the meantime
as the statute required in order to protect his claim and keep it
alive.  Down to that time he was an authorized settler on the
public lands, but not a grantee.  His rights in the land were stat-
utory only, and cannot be extended beyond the just interpreta-
tion of the language Congress has used to make known its will.

"This brings us to the consideration of section 8, which, in
substance, provided that, if a settler died before the expiration
of the required four years' continued possession, all his rights
should descend to his heir at law, including his widow, if he
left one, and that proof of his compliance with the condition of
the act up to the time of his death should be sufficient to entitle
them to the patent.

"Here is a plain indication that the right of the settler before
the expiration of his four years' continued possession was some-
thing less than a title in fee to the land, for the provision is not
that the land shall descend, but the settler's rights only.  Had it
been supposed that the title was already in the settler, subject
only to defeasance, if the conditions subsequent to the grant
should not be performed, we cannot but think that provision
would have been made for a transfer of the land free of the con-
ditions, instead of only the settler's rights.  The object of Con-
gress undoubtedly was to allow a settler's heirs to succeed to
his possessions and thus keep his rights alive.  But for some such
provision all rights of the settler would have been lost by his
death.  As the law required full four years' residence by the per-
son who claimed the grant, if no provision had been made for a
continuance of his possession, the land would have become va-
cant on his death and open for a new settlement by a new settler,
if the law authorizing new settlements still remained in force.

"Hence it was provided that the possessory rights of a de-
ceased settler should go to his heirs, and that they might get
the land on making the requisite proof without further residence
and cultivation of their own.  Their title to the land was to
come, not from their deceased ancestors, but from the United
States. · The title, it is true, was granted to them by reason of

the possessory rights of their ancestor, but these were rights which he could not transfer, and which passed to them under the statute without any act of his. On his death his heirs became qualified grantees. Whether they took immediately on his death or after proof of his compliance with the provisions of the act while in life need not be decided. It is enough for this case that, when their ancestor died, he had nothing in the land which he could transmit to them, and that what they afterward got came from the United States and not from him. All his rights in the land were dependent on his completion of the four years' possession; but, in consideration of what he had done, Congress made his heirs the special objects of its bounty if he died before his own grant had been secured. We attach no importance to the word 'descend,' as used in this section. In section 4 the word selected to convey substantially the same idea was 'entitled.' The thing done was to give the heirs of a settler the benefit of his rights and to designate them as the recipients of the bounty of the government, instead of him.   *   *   *

"It follows from this that Loring, at the time of his death, had no devisable estate in the land, and that the heirs of his devisee cannot maintain this suit. This makes it unnecessary to consider any of the questions that have been argued."

In the case of *Hershberger v. Blewett* (C. C.) 55 Fed. 170:

"I find nothing in *Hall v. Russell* to give colorable support to the argument of complainants' counsel, except a *quaere* in the syllabus, suggested by the following passage in the opinion: 'Whether the fee passed out of the United States before the claim was "proved up" it is not necessary now to consider. For the purposes of the present suit it is enough to show that the occupant got no title himself, beyond a mere right of possession, until he had completed his four years of continued residence and cultivation.' I think an answer to this *quaere,* in harmony with all the decisions of the national courts, is found in the general principle that title does not pass from the United States by a conditional grant of public lands so long as the patent is withheld, and any act required of the grantee as a condition of the grant remains uncompleted."

In the case of *Cooper v. Wilder,* 111 Cal. 196, 43 Pac. 592, 52 Am. St. Rep. 166, construing the timber culture act, section 2466, Rev. Stat. 1878, provided that, in the case of the death of

the grower, his heirs might make the proof, but failed to state whether such heirs take by descent or as new parties substituted in his place and stead. Said section reads:

"No certificate shall be given or patent issued therefor until the expiration of at least ten years from the date of such entry; and if at the expiration of such time, or at any time within three years thereafter, the person making such entry, or, if he be dead, his heirs or legal representatives, shall prove by two creditable witnesses that he has planted and for not less than ten years has cultivated and protected such quantity and character of timber, he shall receive the patent for such quarter section of land."

The facts in the foregoing case are that David Cooper took up a timber culture claim, but died before the expiration of the ten years. Before his death he devised the lands, the will was probated, and the lands distributed to the devisee. The devisee afterward mortgaged the lands, which mortgage was foreclosed, and the lands sold. A controversy arose between the heirs and purchaser as to whether the devisee took the lands under the will, or whether the heirs took it as donee. The court held that, upon the death of the entryman, his heirs, having made the proof, took the land, not by descent, but as substituted new parties; that the entryman, at his death, had no devisable interest or estate in the lands; and that the probate of the will could not vest any title in the devisees not owned by the devisor. The failure to fulfill all the conditions of the grant was the principal reason assigned by the court to justify its conclusions. The court said:

"A failure at any time to perform the conditions works a forfeiture. * * * The death of the applicant before performance renders him incapable of performance, and that event would end the claim but for the provisions of the act, which authorize the heirs to prove that he or they has or have performed, Does the heir in such a case take by inheritance from the applicant, or is he, by appointment in the act itself, a substituted beneficiary of the government to whom the title goes by direct grant? It is admitted, at once, that the condition of the appli-

cant prior to full performance is in no wise analogous to that of a pre-emptor either before or after the pre-emptor has received his certificate of purchase. The applicant has a right to the land of which the government cannot deprive him, but which will be lost if he fails to perform. And death, before performance, renders such failure certain and ends the estate of the applicant. In view, however, of the hardship of such a result the law continues its offer to certain persons whom it is presumed the applicant himself might have selected. But that they take not by inheritance from the deceased, but as grantees from the government. * * * The death of the applicant rendered performance impossible, and the right would have entirely lapsed but for a provision giving the heirs of the applicant the privilege of procuring the title which would have gone to the deceased. * * * We must hold, therefore, that the land was not devisable, and is not affected by the decree of distribution in the estate of David Cooper, deceased. The grant is to the heirs of David Cooper, but they do not take by inheritance "

In the case of *Towner v. Rodegeb,* 33 Wash. 153, 74 Pac. 50, 99 Am. St. Rep. 936, the Supreme Court of Washington held:

"If a homestead claimant dies before patent issues, or before the right to demand a patent has accrued, the land does not become a part of his estate. Upon his death all his rights under the homestead entry cease, and his heirs become entitled to a patent, not because they have succeeded to his equitable interest, but because the law gives them preference as new homesteaders, and allows them the benefit of the residence of their ancestor upon the land. *Gjerstadenger v. Van Duzen,* 7 N. D. 612, 76 N. W. 233, 66 Am. St. Rep. 679; *Chapman v. Price,* 32 Kan. 446, 4 Pac. 807. The same principle, under similar statutory provisions, is applied in the case of death of a pre-emptor. The subsequently perfected title shall inure to the benefit of the heirs, and can neither be devised by the pre-emptor, nor sold in satisfaction of his debts or expenses of administration."

While the foregoing cases do not construe the act in question, yet they construe similar acts and throw some light upon the question before the court. Had Joseph Baptiste made the necessary proof, which would thereby have entitled him to a patent, we would not be called upon to decide this question; but

until proof was made showing the continuous *bona fide* residence of three years, as required by said act, the deceased did not have a devisable interest therein, for if he did not make such proof within four years from his enrollment, either by himself, if alive, or his heirs or personal representatives, if dead, he was to be deemed to have acquired no right in the lands set apart for him, and the same reverted to the tribe and were sold and patent issued to the purchaser.

There are several conditions attached to the right of a Mississippi Choctaw to obtain a patent under the act of 1902, and among the conditions are:   (1) The continuous *bona fide* residence within the Nation for three years; and (2) proof of that fact.   A failure to make this proof within four years forfeited all rights he might have acquired by such residence.   In the instant case Joseph Baptiste performed the conditions which would have entitled him to make the proof and receive his patent, but before making such proof he died; afterwards his heirs furnished such proof, and the patent was issued in the name of Joseph Baptiste, and the title to said lands described herein inured to and vested in the heirs.

We therefore hold that the title to the lands set apart for Joseph Baptiste, under the act of 1902, *supra,* was a conditional grant; and he having died, before complying with the conditions thereof, acquired no devisable estate therein, and section 21 of the act of 1906 conferred upon the heirs a right to make the necessary proof in order that a patent might issue, and upon such proof the title inured to and vested in the heirs of Joseph Baptiste.   The said Joseph Baptiste not having a devisable interest in said land, the probate of the will could not vest title in John B. Criner.

The cause should, therefore, be affirmed.

By the Court:   It is so ordered.