## BLACKWELL v. HARTS et al.

No. 7872—Opinion Filed July 31, 1917.

(167 Pac. 325.)

**1. Indians—Lands—Residence — Conveyance.**

Until a Mississippi Choctaw Indian has, in good faith, resided for three years upon land certified to him, and made proof thereof as required by act of Congress, approved July 1, 1902 (32 Stat. 641, c. 1362), commonly called the "Supplemental Treaty," of said continuous bona fide residence, no alienable interest is acquired by such Indian to the lands certified to him, and cannot legally convey the same.

**2. Taxation—Indians—Allotted Land.**

Lands certified to a Mississippi Choctaw Indian under the act of Cong. of July 1, 1902, commonly called the "Supplemental Treaty," are not subject to be taxed until after proof of bona fide residence upon said land, as required by said act, is made and lands are alienated by such allottee after the making of such proof and the sale of said lands for taxes, prior to the expiration of the time such lands are exempted from taxation, is void.

**3. Lis Pendens—Bona Fide Purchaser—Record.**

Where pending an action for the recovery of land the defendant acquires deeds from the former owners of said lands, he is put upon inquiry as to the title of the plaintiff, and if such inquiry would disclose that the plaintiff had valid prior unrecorded deeds to the lands in controversy from the defendants grantors, such unrecorded deeds of plaintiffs evidence a superior title in paintiff to the title of the defendant, and defendant is not an innocent purchaser.

**4. Sufficiency of Evidence.**

The evidence in this case has been carefully examined, and the weight thereof found to be clearly against the judgment rendered, and hence such judgment must be reversed.

(Syllabus by Collier, C.)

Error from District Court, Carter County; W. F. Freeman, Judge.

Action by A. P. Blackwell against H. B. Harts and others. Judgment for defendants, and plaintiff brings error. Reversed and remanded, with instructions.

Hatchett & Ferguson, for plaintiff in error.

H. B. Harts, and L. S. Dolman, for defendants in error.

Opinion by COLLIER, C. This is an action brought by the plaintiff in error, hereinafter styled plaintiff, against defendants in error, hereinafter styled defendants, to remove cloud upon the titles to lands described in the petition, and to recover possession of said lands.

On the trial the plaintiff testified as follows:

"I was living in Durant, Bryan county, Okla., during the years 1908, 1909, (?), 1912, 1913 and 1914, and am living there now. I purchased the lands in controversy from George A. Dees and Mary E. Wood during the year 1908, the date as shown by the deeds being August 15, 1908. I paid the consideration as shown in the deeds. I iden-

tify the deed executed by George A. Dees as Plaintiff's Exhibit A, and same is offered in evidence as part of my testimony. After I purchased the lands I rented same to Mr. Gill, who has had charge of the lands for me since that date. There was only a small part of the lands in cultivation. Most of the land was outside land. Mr. Gill cultivated what was in cultivation, and had a contract to place some more of the land in cultivation, and during the year 1912 placed in cultivation enough to make in all about 37 acres in cultivation, and during the same year Mr. Gill fenced the 150-acre tract, which is the land purchased from George A. Dees. A part of the 100-acre tract was already in cultivation and had been cultivated by Chas. Marshall, under a contract with Mr. Gill, who acted as my agent. I had no notice whatever of the fact that these lands had been taxed, and had no notice whatever of the amount of the taxes or that the same was to be sold for taxes prior to the sale. I was not notified personally of the application for a tax deed, and I did not know that such application had been made. I did talk with Mr. Harts about redeeming the land after same had been sold for taxes, and he agreed that if I would pay what he had been out and the expense of the sale, he would convey what interest he had in the lands to me. Later I offered to pay him the money, but at this time he refused to accept it, and refused to convey me the lands. When I talked with him about paying the taxes and redeeming the land the tax deed had not been issued, and so far as I knew no application had been made for a tax deed. At the time I purchased these lands from George A. Dees and Mary E. Wood the lands had been designated as their allotment but they, being Mississippi Choctaws, who had not at that time completed their residence, had not received their patents to the land. Later on, after the patents had been issued, I secured new deeds from each of them. The deed from George A. Dees is identified as Plaintiff's Exhibit C, and is herewith introduced in evidence as part of my testimony. The deed from Mary E. Wood and husband W. C. Wood is identified as Plaintiff's Exhibit D and is herewith introduced as part of my testimony. These deeds were taken by me after the grantors George A. Dees and Mary E. Wood had proven up their continuous residence. There was a small additional consideration paid. I do not remember the exact amount. When I talked with him about paying the taxes and redeeming the lands, the tax deed had already been issued and recorded. I made no actual tender of the money. I told him I would pay him what he had been out, but made no further tender. I took the last deeds dated in 1911, after the grantors, Geo. A. Dees and Mary E. Wood, had proven up their three years continuous residence. I took these deeds to correct any defect that might exist because of the fact that the first deeds were taken before they had

proved three years' residence. There was only a small consideration paid by me for these last deeds; they having been executed primarily for the consideration paid when the first deeds were executed."

A Mr. Gill, witness for plaintiff, testifies as follows:

"My name is Gill. I live west of Ardmore in Carter county, Okla., near the lands in controversy. I looked after these lands for Mr. Blackwell after he purchased same in the year 1908. I rented the part in cultivation to Mr. Marshall for Mr. Blackwell to place a part of same in cultivation, and also fenced a part of the land. During the year 1912 I fenced, or had fenced, the 150-acre tract; the land cultivated by Mr. Marshall being the 100-acre tract. I received rents from the land, but do not know just what the amount was. Mr. Blackwell owned other land adjoining the land in controversy. I had charge of his other lands as well as the land in controversy. The 27 acres of land that I placed in cultivation mentioned by Mr. Blackwell in his testimony was largely on the other land, and not on the land in controversy. I am not sure that any of the field in cultivation was on the land in controversy, as I have not measured it and do not know exactly where the lines run. I received notice from defendant H. B. Harts that he (H. B. Harts) claimed the land under a tax deed. I received this notice at the time I was attempting to fence the land. At this time the land was not fenced and outside land."

The defendant in his own behalf testified as follows:

"My name is H. B. Harts. I live at Ardmore, Carter county, Okla. I am an attorney at law. I purchased the lands in controversy when they were offered for sale for taxes, and paid the amount of taxes required, as is shown by tax receipts and certificate of purchase. I have since paid the taxes on said lands from year to year as same has been assessed. After having purchased the land I went out to where it was located, and did not find any one in possession, and I went upon the land and posted signs offering same for sale or rent, and attached my name to the sign. It was after I had posted these signs during the year 1912 that Mr. Gill attempted to fence the 150-acre tract. I gave him notice that the land belonged to me and told him that I did not want him to fence it. The fence was later completed and repaired by F. C. Sullivan, with whom I had made a rental contract I now introduce in evidence, as 'Defendant's Exhibit 1.' the rental contract between myself and Mr. Sullivan, and make same a part of my testimony. I also made a rental contract with Chas. Marshall for the 100-acre tract, being Mary E. Wood's land, under date of August 28, 1912, and said contract is given in evidence herewith and marked 'Defendant's Exhibit 2,' I col-

lected a small rental from said lands from the said parties. I have been in possession of the lands under tenants since that time. None of the land, to the best of my knowledge, was in cultivation at the time I made the contract with the two tenants Sullivan, and Mr. Marshall put in part of the land after I had made the contract with him. I had a conversation with Mr. Blackwell subsequent to my purchasing the land in 1912 at the tax sale, and he stated that he had taken no deeds to this land subsepuent to the first deeds he secured in 1908. Later I went to the allottees George A. Dees an Mary E. Wood, and secured from them quitclaim deeds to this land, which I gave as part of my evidence marked 'Defendant's Exhibit 3,' being quitclaim deed from Mary E. Wood and W. C. Wood her husband, dated February 25, 1914. These deeds each recite a consideration of $1 and other good and valuable consideration. I do not remember the exact amount I paid, but I think it was $5 or $10 to each of these parties. At the time I took these quitclaim deeds I did not know that Mr. Blackwell had his deeds executed in 1911. They had not been recorded, and I had no knowledge that he had any such deeds. I talked with A. P. Blackwell, the plaintiff, after the tax deeds had been executed and recorded in 1912; in that conversation Blackwell stated to me that he was not satisfied with his title, and in some instances he had taken new deeds to perfect the same, but that he had not taken new deeds to the land in controversy. I also talked with Mary E Wood and her husband at the time the quitclaim deeds that I have introduced in evidence were executed, and they stated to me that no new deeds had been executed by them to A. P. Blackwell, and I had no notice that the deeds that I have introduced in evidence were executed, and they stated to me that new deeds had been executed by them to A. P. Blackwell, and I had no notice that the deeds introduced by the plaintiff and dated in 1911 had ever been executed until they were offered in evidence. I paid more than $5 or $10 for the quitclaim deed. My best recollection is that I paid between $25 and $50 for each deed."

The case was tried to the court, and it was found by the court that the defendant is the legal owner in the possession of the lands described in the petition, and his title is valid, perfect, and superior to any rights or interests claimed by the plaintiff, that plaintiff had no right, title, claim, or interests to the said premises, and judgment was rendered accordingly. Plaintiff timely moved for a new trial, which was overruled, excepted to, and error brought to this court.

The title of said Mississippi Choctaw Indians is based upon the act of Congress of July 1, 1902, commonly called the "Supplemental Treaty," parts of which read as follows:

"Sec. 41. All persons duly identified by the Commission to the Five Civilized Tribes under the provisions of secton 21, of the act of Congress approved June 28, 1898 (30 Stats. 495), as Mississippi Choctaws entitled to benefits under article 14 of the treaty between the United States and the Choctaw Nation concluded Sept. 27, 1830, may, at any time within six months after the date of their identification as Mississippi Choctaws by the said Commission, make bona fide settlement within the Choctaw-Chickasaw county, and upon proof of such settlement to such Commission within one year after the date of their said identification as Mississippi Choctaws shall be enrolled by such Commission as Mississippi Choctaws entitled to allotment as herein provided for citizens of the tribes, subject to the special provisions herein provided as to Mississippi Choctaws, and said enrollment shall be final when approved by the Secretary of the Interior. The application of no person for identification as a Mississippi Choctaw shall be received by said Commission after six months subsequent to the date of the final ratification of this agreement and in the disposition of such applications in full-blood Mississippi Choctaw Indians and the descendants of any Mississippi Choctaw Indians whether of full or mixed blood who received a patent to land under the said fourteenth article of the said treaty of 1830 who had not moved to and made bona fide settlement in the Choctaw-Chickasaw country prior to June 28, 1898, shall be deemed to be Mississippi Choctaws entitled to benefits under article 14 of the said treaty of Sept. 27, 1830, and to identification as such by said Commission, but this direction or provision shall be deemed to be invoked by or operate to the advantage of any applicant who is not a Mississippi Choctaw of the full blood, or who is not the descendant of a Mississippi Choctaw who received a patent to land under said treaty, or who is otherwise barred from the right of citizenship in the Choctaw Nation, all of said Mississippi Choctaw so enrolled by said Commission shall be upon a separate roll.

"Sec. 42. When any such Mississippi Choctaw shall have in good faith continuously resided upon the lands of the Choctaw and Chickasaw Nations for a period of three years, including his residence thereon before and after such enrollment, he shall, upon due proof of such continuous, bona fide residence, made in such manner and before such officer as may be designated by the Secretary of the Interior, receive a patent for his allotment, as provided in the Atoka agreement, and he shall hold the lands allotted to him as provided in this agreement for citizen's of the Choctaw and Chickasaw Nations.

"Sec. 43. Applications for enrollment as Mississippi Choctaws, and applications to have land set apart to them as such, must be made personally before the Commission to

the Five Civilized Tribes. Fathers may apply for their minor children; and, if the father be dead, the mother may apply; husbands may apply for wives. Applications for orphans, insane persons, and persons of unsound mind may be made by duly appointed guardian or curator, and for aged and infirm persons by agents duly authorized thereunto by power of attorney, in the discretion of said Commission.

"44. If within four years after such enrollment any such Mississippi Choctaw, or his heirs or representatives if he be dead, fails to make proof of such continuous bona fide residence for the period so prescribed, or up to the time of the death of such Mississippi Choctaw, in case of his death after enrollment, he, and his heirs and representatives if he be dead, shall be deemed to have acquired no interest in the lands set apart to him, and the same shall be sold at public auction for cash, under rules and regulations prescribed by the Secretary of the Interior, and the proceeds paid into the treasurer of the United States to the credit of the Choctaw and Chickasaw Tribes, and distributed [as] per capita with other funds of the tribes. Such lands shall not be sold for less than their appraised value. Upon payment of the full purchase price patent shall issue to the purchaser."

It, therefore, plainly appears that a condition precedent to a right to a legal alienation of said lands was the fact of prior residence of said Mississippi Choctaw Indians in the Choctaw-Chickasaw country, and it being undisputed that, the deeds first executed to the plaintiff having been executed prior to the expiration of the three years of actual residence required by said act of Congress, the said deeds conveyed no title to said plaintiff, as is held in the case of Criner v. Farve et al., 44 Okla. 618, 146 Pac. 10, in the well-considered case by Commissioner Rittenhouse.

The lands having been sold for the taxes of 1909, prior to the expiration of the three years' residence by the said Mississippi Choctaws, who at the time only had a conditional right to said lands, and which said lands were in fact still a part of the Choctaw-Chickasaw Tribal Lands, were not subject to taxation, and the deeds executed under said tax sale are absolutely void, and conveyed no title upon the defendant, as under the unbroken line of decisions of this court and the Supreme Court of the United States, the lands in controversy were not subject to taxation at the time assessed, and for which said tax the same was sold, and it is entirely unnecessary to consider the contention of the plaintiff as to the irregularities in the tax sale.

The deeds subsequently executed by the said Mississippi Choctaws to the plaintiff were not recorded, and therefore we think that the pivotal question in this case is whether or not the defendant by the quitclaim deeds secured from the said Mississippi Choctaw Indians acquired a superior title to the title secured by the plaintiff by the said quitclaim deed secured from said Mississippi Choctaw Indians after they had received patents for said land. The said deeds of the plaintiff executed after the said Mississippi Choctaws had secured the patents to said lands not having been recorded, a material question that presents itself is, Was the plaintiff in possession, either in person or by agent, of the said lands at the time the quitclaim deeds were executed by said Mississippi Choctaw Indians to the defendant? If the plaintiff was in possession of the lands at the time of the execution of said deed, then it was the defendant's duty to have made inquiry as to the title under which the plaintiff held title to said lands, and failing in this, must be regarded as having notice of said deeds acquired by plaintiff after said Mississippi Choctaw Indians had secured patents to said land. In short, the evidence is in irreconcilable conflict upon the question of possession. If possession of the land in controversy was the only ground to require the defendant to make inquiry as to the title of the plaintiff, we think that the judgment of the trial court should be sustained.

Under the deed acquired by plaintiff from the said Mississippi Choctaw Indians, subsequent to proof by them of their bona fide residence upon said lands and issue of the patent to them, and subsequent to the act of Congress of May 27, 1908 (35 Stat. 312, c. 199), the plaintiff acquired title by said after-acquired deeds regardless of the inadequacy of the consideration paid for said lands in absence of fraud or duress in securing said lands. In Henley v. Davis et al., 57 Okla. 45, 156 Pac. 337, it is held:

"A Creek freedman citizen who, subsequent to the taking effect of the act of Congress of May 27, 1908, while a minor, by deed void under the provisions of said act, attempted to convey her allotted lands, may upon arriving at majority convey said lands to the grantee named in her former void deed. Such latter conveyance, made when she is an adult, if regularly and voluntarily executed and without fraud or duress, is valid and binding upon her. Generally mere inadequacy of consideration, in the absence of fraud or duress, is not sufficient ground to void a deed voluntarily and regularly executed."

See, also, Bell v. Mills et al., 60 Okla. 72, 158 Pac. 1173, and Welch v. Ellis, 63 Okla. 158, 163 Pac. 321.

It consequently follows that the pivotal question involved in this case is, Did the defendant have notice of the existence of the deeds of the plaintiff acquired after the patents had issued to said Mississippi Choctaw Indians, or did such facts exist as to put upon inquiry which, if followed up, would have given him such information.

The petition in this case was filed in the district court of Carter county on February 12, 1914, and the deeds acquired from said Mississippi Choctaw Indians by the defendant were executed respectively February 23, 1914, and February 25, 1914; said deeds being executed after the institution of this action which material fact is not referred to in the briefs of either party and probably was not called to the attention of the trial court. That these deeds were executed after the commencement of this action in our opinion, and we so hold, is the turning point in this case.

The petition in this case avers that the plaintiff owns the lands in controversy, and, the defendant having acquired the deeds from the said Mississippi Choctaw Indians, after the institution of this suit, he was put upon inquiry as to the title, under which the plaintiff claimed to own the said lands and, had such inquiry been properly pursued, the defendant would have been informed that the plaintiff had perfect title to said lands, and hence have had constructive notice at the time he secured the said quitclaim deeds of the title of plaintiff and will be considered a purchaser with notice, and by said quitclaim deeds not to have acquired any interest in the lands in controversy as against the plaintiff:

"Pendency of the action is notice of every fact contained in the pleadings which is pertinent to the issue, * * * and also such other facts as those facts necessarily put him upon inquiry for, and as such inquiry, pursued with ordinary diligence and prudence, would bring to his knowledge." 25 Cyc. 1476.

In Ray v. Roe, 2 Blackf. (Ind.) 258, 18 Am. Dec. 159, it is held:

"Pendency of an action is constructive notice of the matter involved in the suit, and a purchaser of the property which is the immediate object of the pending action will be affected by it, as a purchaser with notice."

In Center v. P. & M. Bank et al., 22 Ala. 743, it is held:

"If a subsequent purchaser is put in possession of such facts concerning the title of the vendor as would cause a prudent man to make further inquiry before completing his purchase, he cannot invoke the statutes of registration against a prior bona fide purchaser for valuable consideration, but is chargeable with the notice required by the statute, and entitled to no protection. * * * Lis pendens, which in a chancery suit begins with the filing of the bill and service of subpoena, and continues until the final orders are taken in the case, is notice of every fact contained in the pleadings which is pertinent to the issue, and of the contents of exhibits to the bill which are produced and proved."

In Thomas H. Allen v. William F. Poole and Wife, 54 Miss. 323, it is held:

"One who buys an estate pending a suit involving a question of title thereto will be considered a purchaser with notice, although no party to the suit. Lis pendens is notice of every fact averred in the pleadings, pertinent to the matter in issue or the relief sought, and of the contents of the exhibits filed and proved."

The contention of the plaintiff that at the time plaintiff received his first deeds to said land said Mississippi Choctaw Indians had an equity in said lands which passed to plaintiff, and that, said Mississippi Choctaws having upon receipt of the patents for said lands acquired perfect title to said lands, such perfect title inured to plaintiff, is based upon the wrong premise "that said Mississippi Choctaw Indians had an equity in said lands at the time of the execution of said deeds," and is untenable.

"To permit an Indian deed void when made to operate as a conveyance of title to lands subsequently allotted would be to disregard the express language of the statute and defeat the protective" purpose for which the law was passed. Starr v. Long Jim, 227 U. S. 624, 33 Sup. Ct. 358, 57 L. Ed. 675; Franklin v. Lynch et al., 233 U. S. 269, 34 Sup. Ct. 505, 56 L. Ed. 954.

This being an equity case, we have carefully considered the evidence, and find that the weight thereof is clearly against the judgment rendered.

This cause is reversed and remanded, with instructions to the trial court to render a judgment in accord with the views expressed in this opinion.

By the Court: It is so ordered.